**CHICAGO, B. & Q. R. CO. v. E. BERNIER & SONS, Inc.**

Civil Action No. 499.

District Court, D. Minnesota,
Fourth Division.

July 20, 1944.

Harry S. Stearns (of Stearns & Stearns), of St. Paul, Minn., and C. W. Krohl and C.

A. Conway, both of Chicago, Ill., for plaintiff.

Seward R. Moore, of Minneapolis, Minn. for defendant.

NORDBYE, District Judge.

The matter is before the Court upon a stipulation of facts. Sixteen carloads of onions are involved, but the parties have agreed that all shipments were so similar that the Court's determination with respect to one of the cars would also determine their rights with respect to the remainder. The pertinent facts, therefore, are as follows:

On March 10, 1938, defendant shipped, by straight bill of lading, a carload of Minnesota onions from Minneapolis, Minnesota, to Houston, Texas, via plaintiff's line. When shipping them, the defendant presented to plaintiff certain freight bills on onions from the State of Washington, which defendant had shipped from Wapato, Washington, and Harrah, Washington, to Minneapolis several months prior. The freight charges on the shipment of Minnesota onions to Houston, Texas, were computed on the basis of the Wapato and Harrah, Washington, to Houston, Texas, through rate of $1.01 per hundredweight. Having previously paid the Wapato and Harrah to Minneapolis rate of 80 cents per hundredweight, defendant paid the balance due on the through rate from Wapato and Harrah to Houston—21 cents plus 3½ cents storage charges.

The bill of lading for the Houston shipment shows that the car in question was consigned by "E. Bernier & Sons, Inc.," to "E. Bernier & Sons, Inc., advise C. J. Ogenig Co." The bill of lading also contained the following no-recourse clause, which the defendant signed:

"Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

"The carrier shall not make delivery of his shipment without payment of freight and all other lawful charges.

"(Signed) ――――

"Consignor."

On the face of the bill of lading were these instructions:

"Del. only on surrender of written order from E. Bernier & Sons, Inc."

Section 7 of the bill of lading provides in part as follows:

"* * * The consignor shall be liable for the freight and all other lawful charges except that if the consignor stipulates by signature, in the space provided for that purpose on the face of this bill of lading, that the carrier shall not make delivery without requiring payment of such charges and the carrier, contrary to such stipulation shall make delivery without requiring such payment, the consignor (except as hereinafter provided) shall not be liable for such charges."

When the goods arrived at Houston, the "advise" party presented plaintiff with an order from the defendant and plaintiff released the goods to the advise party. Subsequent to delivery, and for the first time, plaintiff learned that the car in question had contained Minnesota rather than Washington onions, and consequently that defendant had used freight bills for the Washington onions in shipping Minnesota onions. Plaintiff refigured the rates chargeable for the Minneapolis to Houston shipments, computing them by adding together the rate to Minneapolis from the Minnesota onions' point of origin in Minnesota and the rate from Minneapolis to Houston. The difference between the sum of these refigured rates and the charges which defendant prepaid for the shipment of the onions from Minneapolis to Houston constitutes the amount sued for in this action. The computation as to the undercharges is not challenged.

From these facts, two agreed issues arise:

1. Does the C. B. & Q. Tariff 11652–T (the tariff under which the onions in question were shipped) permit onions grown in Minnesota to be substituted at Minneapolis for onions grown in the State of Washington and to move from Minneapolis to their destination on a Washington billing?

2. Does the fact that the defendant signed the no-recourse clause of the bill of lading as consignor relieve it as consignee of the obligation to pay the undercharges?

These issues will be considered in the order stated.

I. In Union Wire Rope Corp. v. Atchison, T. & S. F. R. Co., 8 Cir., 1933, 66 F.2d 965, at page 967, the court stated:

"Our first search is to ascertain whether the carrier has given any guide, in the tariff itself, to the meaning it intends * * *."

A perusal of the pertinent tariff provisions indicates that their general application is as follows:

"Carload shipments of potatoes or onions, originating at points north or west of St. Paul, Minnesota Transfer or Minneapolis, Minn., may be stopped in transit for transfer, rehandling, mixing or storage at St. Paul, Minnesota Transfer or Minneapolis, Minn., and forwarded to points beyond the transit station, (See exception 1 page 3), subject to the provisions of Items 5 to 125, inclusive."

The exception noted on page 3 is not material here.

There is no language in Items 5 to 125, inclusive, which declares expressly whether onions from one rate area (Minnesota), can be substituted for onions from another rate area (Washington). The note to Item 48 of the tariff declares that, "Substitution of onions for potatoes or potatoes for onions will not be permitted." In Item 110, under the title "Substitution Not Permitted," is found the following:

"In the handling of potatoes through transit houses it is not practicable to preserve their identity, but it should be understood the (sic) no substitution will be permitted of potatoes originating in Minnesota, Wisconsin, North Dakota or South Dakota, for potatoes originating in California, Oregon, Washington, Idaho, Montana or British Columbia."

Defendant argues that if it was intended that Minnesota onions could not be substituted for Washington onions, the tariff would have so declared in express language, and urges that the absence of any such example of "substitution not permitted" with respect to onions supports its position that such practice is permissible under the tariff. But, on the contrary, in light of the purpose of transit privileges being accorded to the shipper, and the theory under which it is extended, the example recited in the tariff would seem to negative the very position which the defendant now assumes. Generally speaking, the right of stop-over in transit and the through rate being accorded to the shipper is based on the theory that the movement has not been completed. Various commodities, while shipped in transit to a primary market, may be at that point processed, stored, cleaned, mixed, etc., and upon reshipment from the primary market to its destination,

there is, under the tariff, one continuous movement of the identical article from the point of origin to the final destination. While the form may be changed, it is, notwithstanding, the same product. True, there have grown up certain practices from necessity, so to speak. The mixing of grain may be permitted, and obviously the identical kernels of grain which came inbound may not go outbound, and, as the tariff notes, it is not always practical to preserve the identity of potatoes. Possibly it is not practical to always preserve the identity of onions as well. But no sound reason is forthcoming to support the defendant's contention as to any practical necessity arising which would justify the broad interpretation which it now asserts and which would justify the substitution of onions grown in the State of Minnesota for onions grown in the State of Washington. Where it is not practical to preserve the identity of grain and other products, it has generally been held that the product outbound must at least be "from the same country point." Board of Trade v. United States, 314 U.S. 534, 62 S.Ct. 366, 368, 86 L.Ed. 432; Atchison, Topeka & Santa Fe R. Co. v. United States, 279 U.S. 768, 49 S.Ct. 494, 73 L. Ed. 947. In Boone v. United States, 6 Cir., 109 F.2d 560, at page 563, the court made the following observation: "* * * it is unlawful to substitute or forward under the transit rate any commodity that does not move into the transit point at such rate." A contrary rule would permit a shipper to dispose of or consume at the transit point a large part of the product moved into the transit point at transit rates, and by using inbound freight bills against outbound local ones, ship a product of local origin at the lesser through rate. That is, Minnesota shippers who shipped Minnesota onions from Minneapolis to Houston would not be granted the same rate as defendant herein received when it shipped Minnesota onions from Minneapolis to Houston. Such a result is not only discriminatory but wholly incompatible with the basic theory of transit privileges. The Interstate Commerce Commission has time and time again condemned the practice which the defendant herein seeks to sustain. After an extensive investigation into transit privileges, as reported in The Transit Case, 24 I.C.C. 340, 344–350, it declared:

"The underlying principle of this act is the elimination of unjust discrimination and extortion. * * * The theory under which a transit privilege is granted is that the inbound commodity will be subjected to certain treatment and afterwards moved out under the balance of the through rate. * * *

"Manifestly * * * substitution * * * of other commodities analogous only by their comprehension under a generic term, is in accord neither with the spirit of the law nor the theory under which transit is extended." The Transit Case, 1912, 24 I.C. C. 340, 350.

The only analogy between Minnesota and Washington onions seems to be that they are both of the same generic description—onions.

 In Great Northern R. Co. v. Delmar, 283 U.S. 686, 51 S.Ct. 579, 75 L.Ed. 1349, a case considering a railroad tariff, the Supreme Court held that "where two constructions of a written contract are possible, preference will be given to that which does not result in violation of law." 283 U.S. at page 691, 51 S.Ct. at page 581, 75 L.Ed. 1349. It seems obvious that discriminatory practices in the application of rates will be the result if defendant's position is upheld. Therefore, in interpreting the tariff, it seems reasonable and sound to indulge in a construction, if consistent with the terms of the tariff, which will prevent the existence of this very evil. Certainly, this should be the primary object in endeavoring to ascertain the intent of the framers of this tariff where there is an absence of any specific provision regarding a practice of this kind. Moreover, as stated in Swift & Co. v. Chicago, B. & Q. R. Co., 50 I.C.C. 233, at page 234, "Transit rights must be specifically authorized by tariff provisions; they can not be inferred." Again, in Armour & Co. v. Delaware, L. & W. R. Co., 101 I.C.C. 337, 341, the Commission held: "We have consistently held it would be unlawful for a carrier to allow a substitution of one commodity for another of like quantity from a different rate point without clearly and comprehensively specifying in the published tariffs the right to lose identity or to make substitution."

Defendant has failed to point out any provision in this tariff which suggests or sanctions the practice followed herein. The example of substitution which is not permitted and which is recited in the tariff tends to emphasize the soundness of the construction which is now being advanced

by the plaintiff; that is, if potatoes from Minnesota cannot be substituted for Washington potatoes in taking advantage of the through rate, no good reason is suggested why the same rule should not be applied in the substitution of Minnesota onions' for Washington onions. There are no ambiguities in the tariff which should be resolved in favor of the shipper. There is no showing herein that the so-called rule of necessity lends any support for defendant's position; rather, the undisputed facts would indicate that the defendant sought to avail itself of a substitution which would not only be discriminatory with reference to other Minnesota shippers of like products, but would violate the basic theory and underlying purpose of transit rates. It follows, therefore, that the first question must be answered in the negative.

■ ·II. At the outset, it may be assumed, if not decided, under the rather unusual facts of this case where the undercharges were caused by the unlawful acts of the consignor, that there is no liability on the part of the defendant as consignor for such undercharges. Illinois Steel Co. v. Baltimore & O. R. Co., 320 U.S. 508, 64 S.Ct. 322; Chicago, Great Western R. Co. v. Hopkins, D.C.Minn., 48 F.Supp. 60. But defendant herein was not only the consignor, but was the named consignee in the bill of lading, with the addition, "Advise C. J. Ogenig Co." It is not contended that the no-recourse clause released the consignee for freight undercharges. If, in the instant situation, defendant as consignee had actually received and accepted the shipment, no question would arise as to its liability for the undercharges. Certainly, the no-recourse clause would not affect its liability under such assumed facts. Section 7 of the bill of lading provides that the consignee or the owner is liable for the freight charges. It provides: "The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property." In addition, it may be pointed out that the defendant as consignee herein exercised full control over the shipment during the entire period it proceeded to Houston, Texas. The advise party would get the onions only if the defendant as consignee instructed the plaintiff to deliver the carloads to it. The bill of lading specifically provided: "Del. only on surrender of written order from E. Bernier & Sons, Inc." Thus, if defendant as consignee had decided not to authorize the delivery, it would have been the only one who could have received the onions at Houston. It seems clear that the advise party's right to the shipment was entirely contingent upon the consignee's authorization. Such circumstances and evidences of acts of ownership by the named consignee have been held to create liability upon him for undercharges in situations which, for all practical purposes, are like the one in the instant situation. New York Central R. Co. v. Little-Jones Coal Co., D.C.Ill.1938, 25 F.Supp. 337; New York Central R. Co. v. Union Oil Co., D.C.Pa. 1931, 53 F.2d 1066; Atchison, T. & S. F. R. Co. v. Hunt Bros. Fruit Co., D.C.Mo. 1929, 34 F.2d 582; New York Central R. Co. v. Warren-Ross Lumber Co., 234 N. Y. 261, 137 N.E. 324, 24 A.L.R. 1160; see also Wabash R. Co. v. Horn, 7 Cir., 1930, 40 F.2d 905. But the defendant urges that the advise party became in effect the consignee. This argument may be sound. Erie R. Co. v. H. Rosenstein, Inc., 1928, 249 N.Y. 241, 164 N.E. 37; Chicago Great Western R. Co. v. Schmit, 1925, 163 Minn. 194, 203 N.W. 618; Wabash R. Co. v. Bloomgarden, 1920, 212 Mich. 410, 180 N.W. 443, Note 61 A.L.R. 422. But the liability of the advise party as consignee results exclusively from the receipt of the merchandise by him. An implied contract to pay the lawfully imposed charges arises thereby. This was the view of the court in Atchison, T. & S. F. R. Co. v. Hunt Bros. Fruit Co., supra. In that case, the consignor was also the consignee, and although so far as the opinion shows no advise party was named in the bill of lading, a third party, one McNeill, was to receive the goods upon presentation of the necessary papers to the carrier. This was done. Subsequently, a freight undercharge was discovered. After holding that the defendant was liable as owner and consignee, the court stated (page 583 of 34 F.2d):

" * * * But the defendant here was both consignor and consignee. Until the delivery of the shipments to McNeill the defendant was also owner. Portland Flouring Mills Co. v. [British & Foreign] Marine Insurance Co., 9 Cir., 130 F. 860, 866; Dows v. National Exchange Bank, 91 U.S. 618, 637, 23 L.Ed. 214. So far then as the written contract is concerned the defendant is not only liable, but as owner, consignor, and consignee is the only party liable. If McNeill is also liable, and I think he is, it is not by the terms of the written contract, to which he was not a party, but by the im-

plied contract between himself and the railroad. Compare Union Pacific Railroad Co. v. American Smelting & Refining Co., 8 Cir., 202 F. 720.

"The liability of the defendant, arising from the written contract, and that of McNeill, arising from an implied contract, are independent of each other. Neither is subordinate to the other. Before the defendant can successfully maintain that its liability is subordinate to McNeill's, it must point to something in its contract with the plaintiff so providing. It cannot do that."

It seems reasonable to assume that the no-recourse clause herein was necessarily made in recognition of the contract provision which renders the consignee or owner liable for all charges. It is not denied that the consignee herein remained the owner of the onions from the time that the movement commenced in Minnesota until it ended in Houston, Texas. If loss had occurred before actual delivery, certainly it would have been the shipper's loss, not the advise party's. Hill Veneer Co. v. Monroe, C.C., 189 F. 834. During all of the time the shipment was en route, the consignee could have diverted the shipment; it could have reconsigned it, and it exercised every element of ownership. When the shipments arrived in Houston, the defendant as consignee and owner controlled the disposition of the cars when it ordered that they should be released to the advise party. There are no provisions in the bill of lading which absolved the consignee of liability for freight charges upon the acceptance of a prepaid shipment by the advise party.

It would seem that the ownership and exercise of that right by the consignee herein is just as real and actual as that which existed in New York Central R. Co. v. Little-Jones Coal Co., supra. In that case, the consignor and the consignee were the same. The consignor likewise signed the no-recourse clause. The merchandise involved was subsequently reconsigned with the notation: "Charges follow. We are not responsible for freight charges." Delivery was made in response to the reconsignment without collecting the freight charges. In commenting upon the factual situation, the court stated (page 339 of 25 F.Supp.):

"From a reading of this 'no recourse' clause it seems quite evident that it is designed to protect the shipper if ultimate delivery is made without collecting the freight charges. In this case it was signed by the consignor, who was the shipper, and as such

is relieved of liability. However, defendant was also the consignee; and the question before me is whether or not defendant, as consignee (notwithstanding that it was also the shipper and consignor), having reconsigned the shipments, is liable for the unpaid freight charges."

And in holding the consignee liable as owner, the court said (page 340 of 25 F. Supp.):

"There is nothing in the instant case which would indicate to plaintiff that defendant was acting only as an agent in the transactions. So far as the record goes defendant might have disposed of the shipment of coal in any manner it chose. The Bills of Lading as issued gave it the right to have the shipments delivered to it at the point of destination therein designated; or it had the right, if it wished to exercise it, to order a reconsignment of the shipments, which it in fact did. The weight of authority holds that the reconsignment was an exercise of dominion over the shipments which was consistent with ownership thereof by defendant, and is sufficient to fasten upon it liability for the freight charges.

\* \* \* \* \* \*

"Plaintiff is required to collect the full amount of its charges from the person liable therefor. In this case I believe that defendant, when it directed the cars reconsigned to a third party, became liable for the freight charges on each car, and that such liability was not affected by the notations on the reconsignment order to the effect that charges were to follow the car and that the consignee was not responsible for freight charges. Nor did any subsequent acts or omissions on the part of plaintiff discharge defendant from its liability. If this were otherwise, it would be possible to defeat the express purpose of the statute (49 U.S.C.A. § 6, par. 7), which forbids carriers to discriminate or give rebates in connection with the collection of freight charges."

There, the consignee as owner sought to be released from any liability for freight charges by an alleged substitution. In the instant situation, however, there was no such attempt or understanding, express or implied, with reference to the consignee's liability. See Note, 78 A.L.R. 929, as to liability of the consignee in reconsignment cases. It would seem that the release of liability of the consignor for any undercharges under the no-recourse clause is, under such circumstances, in no way incon-

sistent or incompatible with the continued contract of liability of the consignee as owner under the bill of lading. Michigan Cent. R. Co. v. Saginaw Milling Co., 272 Mich. 625, 262 N.W. 425, has been considered and its conclusions are not in accord with the views expressed herein. However, it does not follow the better reasoning of the Federal decisions cited. Defendant also relies on Chicago, Great Western R. Co. v. E. Bernier & Sons, No. 496 Civil, and Chicago, Great Western R. Co. v. Odegard, No. 498 Civil. These cases were determined by stipulation and no consideration was given by the Court to the issues involved herein.

The conclusions arrived at seem not only sound from a strict construction of the contract liability of the parties, but they also produce a salutary and equitable result. The defendant is in this Court not because of any inadvertence or error on the part of the carrier in computing the rate under the tariff covering these shipments. The defendant is here because of its attempt to deny the carrier its just freight charges and to indulge in a practice which has been condemned by the Interstate Commerce Commission as unlawful. If both the advise party and the defendant as consignee are liable for the undercharges, no sound reason is suggested why, under these circumstances, the advise party is primarily liable and the defendant only secondarily liable. It is the defendant as consignee and owner who entered into a contract with the carrier to pay the freight, and it is this contract which should be enforced herein. The second question should also be answered in the negative.

Findings of fact and conclusions of law in harmony herewith may be presented by the plaintiff. An exception is reserved to the defendant.