Per Curiam :
This is a suit bj plaintiff to recover additional freight charges on shipments of canned goods stored in transit and later reshipped to ultimate destinations on plaintiff’s lines. Trial Commissioner Herbert N. Maletz filed his report consisting of findings of fact and recommended conclusion of law on May 6, 1964. Thereafter plaintiff filed a notice of submission pursuant to Eule 62(a), defendant filed its brief and exceptions and, by leave of court, plaintiff filed a reply brief. The case has been submitted to the court without oral argument of counsel pursuant to Eule 62(c). Upon consideration of the report of Trial Commissioner Maletz and the briefs of the parties, the court is hi agreement with the commissioner’s findings and recommendations, as hereinafter set forth, and adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff in the sum of $46,862.05.
FINDINGS OF FACT
The court having considered the evidence, the report of Trial Commissioner Herbert N. Maletz, and the briefs of the parties, makes findings of fact as follows:
1. Plaintiff, a Delaware corporation, is a common carrier by railroad in interstate commerce over its own lines and jointly with other lines.
2. During the years 1958 and 1959, plaintiff, as the final and delivering carrier, performed transportation services for *569 the defendant by carrying various commodities on Government bills of lading from various points of origin in the United States to destination points on plaintiff’s lines.
3. The parties stipulated that there are various items in suit as to which there is no controversy and that as to these items, plaintiff is due the sum of $41,314.50.
4. The parties stipulated that as to the items in controversy, if plaintiff prevails, it is due the sum of $5,547.55, but that if defendant prevails as to such items, plaintiff is due the sum of $353.23.
5. (a) The parties have agreed that the primary issue in controversy is the applicability of EC-WTA Section 22, Quotation No. 67-A, and amendments thereto, to shipments of foodstuffs, canned, preserved or prepared, that were shipped outbound from the United States Army, Tracy Annex to the Sharpe General Depot (hereafter sometimes referred to as the “Sharpe Depot”), Lyoth, California.
(b) At the pretrial conference plaintiff stated it was its contention that Quotation No. 67-A is not applicable on such shipments that were inbound to the Sharpe Depot by truck and subsequently re-shipped by rail to destination points.
(c) At the pretrial conference defendant stated it was its contention that the shipment of canned goods involved in tins suit complied with all the terms and conditions of Quotation No. 67-A and amendments thereto, and that inbound shipments of canned goods surrendered as a credit on the outbound shipments moved all-rail from point of origin to the Sharpe Depot.
6. (a) The parties stipulated that the following Government transit bills of lading are representative of all the shipments now in controversy:
WZT-310259
WZT-310303
WZT-310390
WZT-310403
WZT-310464
WZT-310565
WZT-311065
WZT-373138
WZT-373256
WZT-373474
WZT-373482
WZT-373511
(b) These bills of lading establish that during 1959 the Transportation Officer of the Sharpe Depot requested plaintiff to transport over its rail lines various carloads of canned goods, in either mixed lots or single lots, from Lyoth, Cali- *570 fomia to various destination points on plaintiff’s lines. The various documents related to these bills of lading establish that the shipments were routed by officers of the Government who complied with established procedures and that plaintiff performed the requested service.
7. The representative bills of lading contain a transit reshipping certificate which sets forth inbound billing references to carloads of various commodities of canned foodstuffs that previously had been transported by rail from various points of origin in the United States and recorded and stored in transit at the Sharpe Depot in Lyoth, California.
¡8. The payment record of the representative shipments shows that in all instances the plaintiff originally billed the defendant on the basis of the through rate from point of origin of the inbound commodity recorded for transit at Lyoth, California, to ultimate destination on plaintiff’s lines, plus a transit charge. Subsequently the plaintiff issued ’supplemental bills based on correction notices issued by the Trans-Continental Freight Bureau (Weighing and Inspection Department, South Pacific Coast Territory) which claimed transit disallowance for the local charges on portions of the outbound shipments. These are the charges now in dispute.
•9. On June 2, 1955, following a series of conferences and negotiations, EC-WTA Section 22, Quotation No. 67, providing transit arrangements on foodstuffs, canned, preserved or prepared, was issued by the traffic association of the carriers and accepted by the defendant to be applicable to all such shipments moving after May 3,1955. On June 24,1959, EC-WTA Section 22, Quotation No. 67-A was issued effective August 12, 1959, superseding and canceling EC-WTA Section 22, Quotation No. 67, as amended. The parties have agreed that the terms and conditions of Quotation No. 67-A are to be deemed applicable to the shipments in controversy.
10. (a) The background events leading to the issuance of Quotation No. 67 were, as follows:
Military storage centers for canned goods are wholesale points of receipt and retail points of distribution. Prior to the issuance of Quotation No. 67, the rail transit quotations on canned goods restricted the inbound and outbound move *571 ment to tlie same kind of commodity, e.g. “peas outbound for peas inbound”, “beans outbound for beans inbound”. Since tibe Quartermaster Corps operated on a retail basis in distributing the canned goods, it was necessary to make up mixed shipments of canned goods for rail movements outbound. In these circumstances, Quotation No. 67 was adopted to allow a broader application of the tonnage credits on a liberal substitution basis which would permit use of commodities in a broad category and use of a single inbound credit against outbound mixed-carload shipments.
(b) At no time during the negotiations for the issuance of Quotation No. 67 was any request made by the Government to permit the application of transit credits generated by inbound shipments of canned goods by rail as a credit on the payment of transportation charges for outbound shipments of canned goods that had moved into the transit point by truck.
11. (a) On July 5, 1957, following a discussion as to the maimer in which cancellation of transit credits was being conducted, A. M. Fielding, Superintendent of the Transcontinental Freight Bureau, Weighing and Inspection Department, addressed a letter reading as follows to the Transportation Officer of the Sharpe Depot:
It has been brought to our attention that the Military Traffic Management Agency has protested the manner in which the cancellation of excess credits in connection with transit commodities subject to EC-WTA Quotation No. 67 is being conducted at Sharpe General Depot.
Attention is directed to paragraph (g), Item No. 16 as revised in Amendment No. 6 to EC-WTA Quotation No. 67.
As originally published, Item No. 16(g) required that credits be cancelled, “_as to each commodity, in excess of tonnage on hand,_”. As revised in Amendment No. 6, the phrase, “as to each commodity,” has been eliminated, and the words, “as to each group of commodities shown in Appendix A_,” substituted.
The purpose of this change is to permit the installation to surrender credits covering any commodity within the respective groups to equalize the lack of inventory for *572 any other commodity within the same group, at the discretion of the transportation officer.
It is requested that tonnage statement be prepared showing each commodity separately, as heretofore, and arranged by groups as shown in Appendix A, EC-WTA Quotation No. 67.
Cancellation of excess credits will henceforth be accomplished by commodity group and not by commodity.
(b) This amendment was carried forward to EC-WTA Quotation No. 67-A in Item No. 16(g).
(c) The Government and freight bureau representatives understood that this letter referred to the cancellation of tonnage that came into the Depot by rail and did not refer to tonnage moving into the Depot by truck.
(d) After July 5, 1957, the defendant operated on the basis of the information in this letter.
12. EC-WTA Section 22 Quotation No. 67-A reads in part:
Item No. 1

Traffic Covered

The traffic covered is the commodities listed in Appendix A hereto, when originating at points in the Conti-ental United States, at Puerto Rico, or the Territory of Hawaii, shipped by the Department of the Army, Department of Air Force, Department of the Navy, or United States Marine Corps, hereinafter referred to as “the Government,” on Government bills of lading, or on commercial bills of lading endorsed to show that such bills of lading will be exchanged for Government bills of lading at destination, or on prepaid commercial bills of lading when such prepaid commercial bill of lading or the prepaid freight bill issued at the transit point bears endorsement “This shipment is the property of, and the freight charges are assumed by the United States Government,” moving all-rail, in carloads, consigned to and completely unloaded at a transit point listed in Item No. 4, hereinafter referred to as the “transit point,” for the transit privilege described in Items Nos. 2 and 3, and subsequently reshipped all-rail, in carloads, 40: * * *.
*573 Item No. 2

Transit Privilege

Each shipment of the kind described in Item No. 1 may be stopped in transit at not more than two (2) transit points listed in Item No. 4 for storage and/or the additional transit privileges described in Item No. 3, by and at the expense of the Government, and reshipped therefrom, all-rail, in carloads, to a port, destination or rail-head as defined in Item No. 1, at the through all-rail rate specified in Item No. 6. Such stopping is referred to as the “transit privilege.” Each shipment shall be entitled to not more than two transit privileges between initial point of origin or port of importation and port, destination or railhead.
* * * * *
Item No. 6

Bates and Charges To Be Applied Inbownd Bate

Each shipment must be consigned to the transit point. The rate to be applied shall be the applicable all-rail carload rate on such shipment from its initial point of origin or port of importation, in effect by tariff or as provided in any applicable Quotation on the date of shipment therefrom to the transit point, applicable on freight having its destination at such point.

Through Bate

(a) When reshipped from the transit point within twelve (12) months (see Note) from the date of the inbound freight bill:
Each shipment made from its initial point of origin or port of importation on and after the effective date hereof, shall be subject and entitled to the all-rail carload rate (local, joint or combination) applicable on the inbound or outbound commodity, whichever is higher, from such point of origin or port of importation to port, destination or railhead, as described in (a), (b), (c) or (d) of Item No. 1, in effect by tariff or as provided in any applicable Quotation on the date of such shipment from initial point of origin or port of importation.
*574 Item No. 12

Transfer of Tonnage at Transit Points

(a) Transit tonnage may be transferred by and at the expense of the Government, between warehouses or depots within the switching limits of the transit point, and inbound billing covering shipments to one warehouse or depot may be applied against outbound shipments from either of such warehouses or depots.
(b) Transfer of transit commodities will be permitted on entire carloads, between transit operators under the provisions of this Quotation. When transit commodities have been. transferred, the transit forms referred to in Item No. 16 shall be completed by the Government and endorsed “Tonnage transferred to _!_” Copies of transit forms shall be distributed as required by Item No. 16.
* * * * «
Item No. 15
Inbound and Outbound Shipments — Quantity and Character — Tonnage Credits
(a) Outbound shipments must be representative of the commodity or commodities (articles within the same numbered groups in Appendix A hereto) covered by the inbound freight bill or bills against which such shipments are matched. Freight bills or tonnage credits representative of the commodity forwarded from the transit point must be surrendered for that portion of the carload upon which the transit privilege is accorded.
It is not expected that the identity of each inbound and outbound carload will be preserved, but it is not permissible to make any substitution that impairs the integrity of the applicable through rate. (The integrity of the applicable through rate shall not be considered as impaired when inbound freight bills or tonnage credits are surrendered against outbound shipments of the same type of commodity (articles within the same numbered groups in Appendix A hereto), provided the entire transportation from the point covered by the surrendered inbound freight bills or tonnage credits to the port, destination or railhead of the outbound shipment, via the transit point, involves transportation in the same general direction and as to which rates are applicable via the transit point.)
*575 NOTE: The Government agrees that it will, to the extent practicable, endeavor to maintain the integrity of the applicable through rate.
(b) (1) When the weight of the transit commodities in an outbound shipment is less than the actual weight of the inbound billing matched against the outbound shipment, excess weight on the inbound billing will remain to the credit of the Government for application against subsequent shipments.
(2) When tonnage credits are presented for greater actual weight than the weight of the outbound shipment, additional tonnage credits will be issued for the excess weight.
(c) When the actual weight of the outbound shipment exceeds the actual weight of the inbound billing surrendered, the excess outbound weight comprising the same transit commodities as covered by this Quotation, will be charged at the applicable carload rate from the transit point to destination, and such weight may be used to make up the carload minimum weight.
^ ‡ ‡ #
(f) An outbound car containing transit tonnage may also include commodities not covered by this Quotation, which will be charged at the applicable carload rate (or rates) at the actual weight thereof, from the transit point to port, destination or railhead? in effect on the date of reshipment from the transit point. Such weight shall not be used to make up the carload minimum weight.
Item No. 16
Transit Records, Cancellation of Tonnage — Reference to Inbownd Shipments on Outbound Bills of Lading
(a) The transit privilege shall be accorded only upon written application by the Government to the General Freight Department of the railroad granting the transit privilege, to the Weighing and Inspection Bureau having jurisdiction, or to any other duly authorized representative of the railroad.
(b) The inbound line-haul railroad serving the transit point will be the transit-granting railroad and will supervise the transit privilege in accordance with the provisions hereof. All arrangements for the outbound movement of each shipment from such transit point must be made with such inbound railroad.
(c) The Government shall keep a record of receipts from all sources and of all dispositions of tonnage sub *576 ject hereto upon forms specified in (e) of this item. Subject to security regulations, the Government shall give the representative of the Weighing and Inspection Bureau, or other authorized representative of the railroad, access to all necessary records for the purpose of determining the observance of the provisions hereof.
(d) Inbound bills of lading covering shipments to be recorded for transit shall be endorsed by a representative of the Government:
“Becorded for Transit.”
This endorsement is to be placed opposite the words: “Consignee’s Certificate of Delivery Consignee must not pay any charges on this shipment”
on the standard form of Government bill of lading.
On shipments moving on commercial prepaid bills of lading, the transit-granting railroad’s agent will furnish the Government sufficient duplicate copies of the inbound prepaid freight bills for recording. Such freight bills shall be endorsed by a representative of the Government:
“Becorded for Transit.”
(e) The Government shall cause inbound freight bills covering shipments to be recorded with the representative of the railroads within thirty (30) days from the date of the inbound freight bill, but failure of the inbound railroad to present freight bills within the prescribed time shall not deprive the shipments of the transit privilege if such failure is reported to the representative of the railroad within such thirty (30) day period. Within the same time limit, a record shall be prepared on W.D. A.G.O. Form 55-105 or DD Form 575 of the Department of the Army and Department of Air Force, Sanda Form 711 of the Department of the Navy, or a similar form of the United States Marine Corps, by a representative of the Government, covering each shipment recorded.
When the inbound tonnage has been fully surrendered for outbound shipment under transit, or fully disposed of otherwise than by surrendering for transit, forms required by (e) of this Item shall he completed by the representative of the Government who shall retain the original as the transit record, surrender one copy to the Weighing and Inspection Bureau representative or to the railroad agent at the transit point, and forward required copies, once each week to:
*577 The General Accounting Office
Transportation Division
Washington 25, D.C.
(f) The representative of the Government shall type or otherwise endorse on the outbound bill of lading under the heading: “Transit Reshipping Certificate — Inbound Billing Reference” the following information:
(1) Inbound Govermnent bill of lading number (including the lettered prefix) and date or notation “Commercial Prepaid Bill of Lading”;
(2) Bureau number, or freight bill date and number (if any). When making first application against inbound freight bill, indicate circle reference (1); if credit application, indicate circle reference (2);
(3) Inbound waybill date and number;
(4) Origin Station;
(5) Commodity;
(6) Route;
(7) Rate paid in including any transit charges;
(8) Inbound car initials and number;
(9) Weight applied (separate outbound weights for each inbound shipment);
(101 Reference by number to this Quotation;
(11) All previous transit reference must be shown when second transit privilege is granted.
An extra copy of the outbound bill of lading with the inbound reference required by this Item shall be furnished by the representative of the Government to the Weighing and Inspection Bureau representative or the railroad agent at the transit point.
(g) As of June 30 and December 31, and at such other times as may appear necessary, the Weighing and Inspection Bureau representative, or railroad agent, and a representative of the Government jointly shall check the inbound billing on hand against the inventory of tonnage on hand and shall cancel inbound billing, as to each group of commodities shown in Appendix A hereof, in excess of tonnage on hand, starting with the oldest representative inbound billing.
Item No. 17

Method of Settlement

On each shipment from a transit point to a port, destination or railhead, referred to in Item No. 1, the *578 Government shall pay the through rate applicable on such shipment, as specified in Item No. 6, plus any other charges accruing hereunder in addition to such through rate, minus the line-haul rate (in the case of two (2) transit privileges, the sum of the rates) paid on such shipment into such transit point (or points), and if such through rate is less than the rate (or rates) so paid, the railroads will make appropriate refund to the Government.
In the event settlement with the railroad of freight charges on the inbound shipment or shipments to either or both of the transit points has been or later is effected on a basis different from that shown by the application of inbound billing against the outbound shipment, the Government shall make final settlement as provided in this Item on the basis of the actual freight charges paid by the Government.
Item No. 18

Definition of Non-Transit Tonnage

Wherever the term “non-transit” appears herein, it means tonnage:
(a) Upon which the time limit for the transit privilege or privileges has expired;
(b) Originating at or purchased locally at the transit point;
(c) Originating at points not subject to transit rates or received other than by rail;
(d) Destined to points not subject to transit rates;
(e) Disposed of locally at transit point.
Item No. 19

Routing

No application herein contained shall affect the integrity of the through rate insofar as the applicable routes are concerned. The routes in effect on the date of shipment from initial point or port of origin via the transit point (or points) to port, destination or railhead will apply.
sfi $ $ * *
Item No. 22

Conditions Under Which Transit Privilege Is Applicable

The application of the transit privilege (or privileges) is conditioned upon adherence to the provisions hereof. *579 On a shipment (or shipments) as to which the Government fails or refuses to comply with any of the provisions of this Quotation, the transit privilege (or privileges) shall not be applicable.
Item No. 23

Effective Date

This Quotation shall be in effect and applicable to all shipments moving hereunder from initial point of origin or port of importation, or which may be in storage, on and after August 12,1959.
Effective as of said date, August 12,1959, this Quotation supersedes and cancels
TEA-EB» Section 22 Quotation No. A-1496
EC-WTA Section 22 Quotation No. 67
SFA Section 22 Quotation Advice No. A-1307
as amended, without prejudice to any accrued rights and liabilities of either party thereunder.
APPENDIX A
Commodities
(See Item No. 1) _
_ Group #1, viz:
13. The types of commodities in controversy here are listed under Group #1 of Appendix A.
14. (a) The Tracy Annex of the Sharpe General Depot at Lyoth, California, was a principal storage center maintained by the Department of Defense for the storing and distribution of non-perishable subsistence stores, medical stores and construction supplies. Canned goods and other non-perishable subsistence stores were stored in five large warehouses, where inbound shipments transported by truck were commingled with inbound shipments received by rail, and no attempt was made by the installation to segregate rail inbound commodities from truck inbound commodities.
(b) A record was kept by the Depot as to the location of each lot of goods stored and a receiving report of inbound shipments was prepared and forwarded to the National Inventory Control Point, a separate agency of defendant, located at Columbus, Ohio, where a physical inventory of all canned goods was maintained.
(c) Shipments of canned goods were forwarded to the Sharpe Depot either by rail or truck. The freight bills *580 covering inbound shipments by rail were recorded for transit, a bureau number was assigned by the railroads, and they became a part of the transit credits available for the transit balance on the outbound shipments. Inbound shipments by truck were not recorded for transit.
(d) On shipments of canned goods moving outbound by truck under the provisions of Quotation No. 67-A, transit credits were not surrendered or canceled during the period from January 1,1959 to June 30,1961.
(e) Outbound shipments of canned goods by rail were forwarded under transit bills of lading, and transit credits representing tonnage inbound by rail were surrendered for that portion of the shipment moving under the transit privilege, thereby reducing the credit balance of canned goods received by rail.
15. Item 16(g) of Quotation No. 67-A provided that every six months a railroad and Government representative “jointly shall check the inbound billing on hand against the inventory of tonnage on hand and shall cancel inbound billings, as to each group of commodities shown in Appendix A hereof, in excess of tonnage on hand * * *” No tonnage was canceled under this item since the total tonnage on hand in the Depot during the period from January 1, 1959 to June 30,1961 always exceeded the tonnage of transit credits available.
16. The Trans-Continental Freight Bureau has, among other things, responsibility for the policing of transit privileges for both commercial and Government operations. When an investigation of a commercial operation by the Bureau disclosed that a transit operator claimed transit credits on inbound shipments of goods by other than rail, the Bureau would issue correction notices to the operator. It followed an identical procedure where the Government claimed transit credits on inbound shipments of goods by other than rail under a commercial transit tariff on canned goods.
17. (a) In 1961 representatives of the Western Weighing and Inspection Department of the Trans-Continental Freight Bureau conducted an investigation and an overall audit, covering the period January 1, 1959 to June 30, 1959, of *581 canned goods recorded for transit under the terms and conditions of Quotation No. 67-A and the actual physical inventory of the canned goods stored at the Sharpe Depot, Lyoth, California. The representatives were given access to all necessary records at the Deport in accordance with the provisions of Item 16 (c) of Quotation No. 67-A.
(b) The Government’s December 31, 1958 inventory of tonnage at hand was used as the base figure for initiation of the audit. An audit report was subsequently prepared by representatives of the Western Weighing and Inspection Department which showed the transit tonnage of individual commodities listed in Group #1 of Appendix A of Quotation No. 67-A, handled for the period January 1, 1959 through June 30,1961.
(c) The audit report was prepared on a monthly basis showing for each individual commodity (1) the transit tonnage available in the Depot at the beginning of each month, (2) the transit tonnage received in the Depot during the month, (3) the total transit tonnage available to be forwarded from the Depot on the last day of the month, (4) the transit tonnage actually forwarded from the Depot during the month, and (5) if the transit tonnage forwarded from the Depot during the month exceeded the total transit tonnage available at the Depot, such excess amount was shown as “non-transit” on the basis that it had been received at the Depot by other than rail. The report contained a “recap” of transit tonnage handled for the period January 1,1959 to June 30, 1961.
18. (a) Subsequent to the completion of the audit report, representatives of the Western Weighing and Inspection Department prepared correction notices based upon the excess tonnage shown in the “non-transit” column of the monthly audit statements, which excess tonnage the Trans-Continental Freight Bureau considered to be canned goods that had been moved into the Depot by other than rail. The correction notices in all instances were predicated on the audit report prepared by the Bureau on the tonnage of those commodities that moved outbound by rail from the Depot and had previously moved inbound to the Depot by other than rail. The correction notices set forth that some of the commodities *582 shipped outbound from the Depot on Government transit bills of lading were not entitled to the transit privilege on the ground that Item 18(c) of Quotation No. 67-A had been violated.
(b) The Bureau placed on each correction notice a rubber stamp impression which read:
I certify that the elimination of transit as indicated hereon is in accordance with the records and the facts.
Signature_
Title_
Sharpe General Depot, Lathrop, California.
(c) Because of the implications involved, Lt. Colonel W. G. Stotlar, the Transportation Officer of the Sharpe Depot, refused to sign the certification in the correction notice until he received instructions from higher headquarters, i.e., the Western Traffic Region, Military Traffic Agency, Oakland Army Terminal, Oakland, California. On October 26,1961, that agency wrote to Colonel Stotler, as follows:
1. This refers to a re-audit of the transit account recently made by the Trans-Continental Freight Bureau, Weighing and Inspection Department, relating to the transit privileges on canned goods over the past two and one half year period beginning with January 1959, at Sharpe General Depot.
2. As you will recall, the representative of the TCFB conducted an audit, and subsequent reports disclosed several discrepancies in the tonnage figures, as between the Sharpe General Depot account and the railroad accounts of the Southern Pacific and Western Pacific. The. tonnage figures were later submitted through this Regional Office to our Headquarters MTMA in Washington, and rechecked and returned.
3. A conference with TCFB official and railroad executive officers was then held on the matter of reconciling divergent views with respect to applications of the technical rules and regulations under the existing special transit quotation applicable to this traffic, and the railroads officially advised this office of their intention to have the TCFB complete the audit and present certified statements of accounts, for collection of the outstanding undercharges, on shipments made on and after January 1959.
*583 4. This office was subsequently advised that the TCFB statements are now awaiting certification by your Headquarters, as a preliminary step to their presentation to the two railroads. Headquarters MTMA was duly advised of this, and has advised that your Headquarters should make appropriate certification of the accounts, on the basis that such action does not constitute any admission of Government liability for alleged undercharges, but merely certifies to the figures of tonnage of the various commodities, as developed by the railroad re-audit.
5. This letter requests Sharpe General Depot to make the usual form of certification on TCFB statements, commencing with shipments from 1 January 1959 to date and presentation of such certification to the Transcontinental Freight Bureau representative, at the earliest practicable date.
(d) Copies of this letter were addressed by the Western Traffic Begion of the Military Traffic Agency to the Transcontinental Freight Bureau, the Southern Pacific Company, and the Western Pacific Eailroad.
(e) Upon receipt of this letter Colonel Stotlar signed each certification placed on the correction notices.
(f) Colonel Stotlar conceded at trial that in signing the certification he certified to the fact that the tonnage that moved inbound to the Depot by other than rail, as set forth in the audit report and correction notices, was non-transit tonnage.
EXPERT TESTIMONY
19. Plaintiff presented as a witness Mr. Elgin Kreger, Assistant to the Superintendent of the Trans-Continental Freight Bureau, who had the responsibility of supervising the handling and policing of transit privileges for both commercial and Government operations. He testified that his investigations were based upon the provisions of the particular transit tariff and that the transit privilege varied; and that there is only one method in surrendering transit credits to apply on transit shipments, i.e., when an outbound shipment is tendered for transit, the outbound bill of lading is so noted and enough recorded freight bills or credit slips of tonnage are surrendered to account for the transit ton *584 nage on tbe outbound shipment. He testified that the transit credit or tonnage credit available for application on the outbound shipment is a record of the particular commodity being received at the transit point by rail and that it was not necessary that the particular physical shipment represented by the credit move out on that bill of lading.
Mr. Kreger testified that on any commodity in Group #1 of Appendix A of Quotation No. 67-A that is received by rail, the transit credit so established could be surrendered to apply on the outbound movement by rail of other commodities within the same Group #1, provided that commodities had moved into the transit station by rail and had been recorded for transit; and that tins is referred to as the liberal substitution rule. He expressed the opinion that under Item 15 (a) of Quotation No. 67-A, the integrity of the through rate would be impaired and not protected if the commodity that moved outbound from the transit station by rail had been received at the transit station by truck.
20. (a) Defendant presented as a witness Mr. James J. Broz, the Executive Officer of the Regional Office of the Western Traffic Region, Defense Traffic Management Service. He testified that the Quotation in question relates solely to inbound shipments by rail and outbound shipments by rail; that inbound shipments by truck are not covered by the Quotation; that there is nothing in the Quotation that would either permit or not permit the consideration of truck tonnage as part of the rail transit arrangement; and that the transit privilege in the Quotation applies to inbound rail shipments recorded for transit, which are called transit credits, and that these credits are applied against outbound shipments by rail. He testified that if shipments came into the Depot by rail and went out by truck, the integrity of the through rail rate would not be maintained and the movement would not be considered a transit movement.
(b) Defendant also presented as a witness Mr. Howard Wagner, the Traffic Manager of the Tracy Defense Depot at Lyoth, California, who defined the term “protect the integrity of the through rate” as meaning that “it had to be a rail movement inbound and a rail movement outbound of canned goods in the same general direction through the *585 transit point.” He testified that in his opinion the commodities listed in Group #1 of Appendix A were in effect one commodity — “canned goods”.
Conclusion
21. Eeference to a representative bill of lading No. WZT-310259 is helpful in an understanding of the basic issue here involved. That bill of lading demonstrates that 7,110 pounds of sausage, among other things, was shipped over plaintiff’s rail lines outbound from the Sharpe Depot in February 1959. However, the Trans-Continental Freight Bureau’s audit report (which is undisputed) disclosed (1) that as of February 1, 1959, no “transit tonnage” of sausage was available at the Depot (i.e., tonnage received at the Depot by rail), and (2) that during that month no transit tonnage of sausage had been received at the Depot. Despite this, the audit report showed that in that month 321,328 pounds of sausage was shipped out of the Depot by rail. From this the audit report concluded (and the witnesses so agreed) that the 321,328 pounds of sausage had to have been received at the Depot by other than rail (i.e., by truck). With respect to the outbound rail shipment of the 7,116 pounds of sausage in question, the Government applied as a credit on the transportation payment therefor, transit credits created by shipments into the Depot of canned goods by rail.[1] The plaintiff issued a correction notice disallowing application of the transit privilege for the outbound rail shipment of sausage on the ground that that tonnage of sausage had been shipped into the Depot by other than rail. Also on the same basis plaintiff issued correction notices disallowing transit on the weight of various other commodities shipped outbound from the Depot by rail which the audit report showed to have been moved into the Depot by other than rail.
Plaintiff contends that it is entitled to recover the local charge on the weight of the commodities in question from *586 the transit point to ultimate destination, as provided in Item No. 15 (f) of Quotation No. 67-A which reads: “An outbound car containing transit tonnage may also include commodities not covered by this quotation, but will be charged at the applicable carload rate (or rates), at the actual weight thereof, from the transit point to port, destination or rail head, in effect on the date of reshipment from the transit point * * *” Plaintiff maintains that this language is unambiguous and that in conjunction with Items 1, 18, 19 and 22, Quotation No. 67-A does not permit the Government to apply transit credits created by inbound shipments of canned goods by rail as a credit on the payment of outbound shipments of canned goods that had been moved into the transit point by other than rail. It further argues that application of the transit privilege in the manner sought by defendant would destroy the integrity of the through rate and be contrary to established principles of transit.
Defendant, on the other hand, argues that the Government, in surrendering transit credits created by inbound rail shipments of canned goods for outbound rail shipments of canned goods, was proceeding in compliance with the terms of Quotation No. 67-A, particularly in light of the statement by the Trans-Continental Freight Bureau on July 5, 1957, and the provision of Item 15(a) that it is not necessary to preserve the identity of each inbound and outbound cargo. In other words, defendant contends that only one commodity— canned goods — is involved here and that at all times there were sufficient credits on hand of inbound rail shipments to surrender on outbound rail shipments.
From an examination of Quotation No. 67-A, it would seem clear that the parties intended by its issuance to afford a transit privilege on a liberal substitution basis, with the privilege limited to shipments of commodities that moved inbound by rail to the transit point and outbound by rail therefrom. Thus, Appendix A of the Quotation specifies that the commodities listed therein pertain to the traffic covered in Item No. 1 of the Quotation and that Item, in turn, provides specifically that the “commodities listed in Appendix A * * * moved (d) all-rail, in carloads consigned to and completely unloaded at a transit point * * * for the *587 transit privilege described in Item Nos. 2 and 8, and subsequently resbipped all-rail in carloads * * *” Further, Item No. 18(c) defines “non-transit tonnage” to mean, among other things, tonnage received at the transit point “other than by rail.” It is thus apparent that under the Quotation the transit privilege is not applicable to inbound shipments by truck that were subsequently reshipped by rail to destination points. Defendant apparently does not dispute this but says that the Government had at all times sufficient transit credits created by inbound rail shipments of goods which it surrendered on outbound rail shipments and that it was thus proceeding in full compliance with the Quotation. To place the problem in perspective, it must be added that the transit credits so surrendered were for outbound shipments that had moved into the transit point by truck. In short, the question here is to ascertain whether Quotation No. 67-A permits application of the transit privilege in the manner sought by the Government, i.e., by using transit credits generated by inbound rail shipments as a credit on payment of freight charges for outbound rail shipments that had come into the transit point by truck.
The transit privilege “rests upon the fiction that the incoming and the outgoing transportation services, which are in fact distinct, constitute a continuous shipment of the identical article from point of origin to final destination.” Central R.R. Co. v. United States, 257 U.S. 247, 257 (1921). See also Utah Poultry Producers Co-op. v. Union Pac. R. Co., 147 F. 2d 975, 976 (10th Cir., 1945); Chicago, B. & Q. R. Co. v. E. Bernier & Sons, 56 F. Supp. 691, 692 (D. Minn., 1944). The transit privilege grants “special concessions to a shipper”, Utah Poultry Producers Co-op. v. Union Pac. R. Co., supra, p. 977, and is a right which must be specifically authorized by the provisions of the tariff or quotation; it cannot be inferred. Ibid. See also Chicago, B. & Q. R. Co. v. E. Bernier & Sons, supra, p. 693. It is significant in light of these considerations that there is no express language in the Quotation specifically permitting application of the transit privilege in the manner sought here: in the absence of such authorization there seems no warrant for thus extending the privilege. Further, the absence of au *588 thorization would in itself appear to be some indication that the parties did not intend that transit apply in the manner now, sought — an indication which is buttressed by the fact that at no time during the negotiations leading to the issuance of the Quotation did the Government seek permission for such application of transit. Nor can the letter of July 5, 1957 — on which defendant places reliance — be construed as granting such permission; that letter, as the parties understood, referred only to transit commodities; it had no application to non-transit tonnage, i.e., tonnage moving to the Depot by other than rail.
Beyond these considerations, to allow the transit privilege for the shipments in controversy would impair the integrity of the through rate in frustration of Items 15(a) and 19, and would be contrary to established principles of law relating to transit. Indeed it was for such reasons that the Circuit Court of Appeals in Utah Poultry Producers Co-op. v. Union Pac. R. Co., supra, forbade a commercial transit operator to apply transit credits in a manner similar to that attempted by the Government here. As the court said (147 F. 2d 977) : “Transit privileges grant special concessions to a shipper. In permitting them, the Interstate Commerce Commission has been zealous in protecting the integrity of the through rate. It is made plain in all its decisions that unless such privileges are carefully circumscribed, they permit opening the doors to discrimination and thus tend to destroy the integrity of the through rate. While transit privileges are justified solely on the theory that the identical article or its exact equivalent or its product is finally shipped to the ultimate destination, some substitution is permitted under carefully formulated rules and regulations. Where substitution has been permitted, it has been of a similar article from the same or a comparable rate point. In this way, the integrity of the through rate is preserved, and discrimination and unfair trade practices are prevented.”
The following which is paraphrased from the court’s opinion is particularly pertinent here (ibid): “To adopt the theory of the (Government) would permit it to obtain credit slips for (canned goods) that came into its warehouse * * * over the Kailroad’s lines * * * and reship (canned goods) *589 which, came in by truck, and use the credit slips in future payment of the freight thereon. This would utterly destroy the principle of the through rate and the fundamental theory of a transit rate. Such a reshipment would bear no relation to the inbound shipment stopped temporarily in transit.”
22. For these reasons, it is my opinion that defendant was not permitted under Quotation No. 67-A to use transit credits created by inbound rail shipments as a credit on payment of outbound rail shipments that had moved into the Depot by truck. It is therefore concluded that plaintiff is due the sum of $5,547.55 on the shipments in controversy. Since it has been stipulated that as to the items not in controversy plaintiff is due the sum of $41,314.50, it is recommended that the court enter judgment for plaintiff in the amount of $46,862.05.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States the sum of forty-six thousand eight hundred sixty-two dollars and five cents ($46,862.05).

 By such application of the transit privilege, the Government’s obligation for payment of freight charges on goods shipped from the Depot to final destination points was reduced to the extent that it had to pay only the local portion of an all-rail through rate (on the basis set forth in finding 8) rather than a higher local rate.