CENTRAL RAILROAD COMPANY OF NEW JERSEY ET AL. v. UNITED STATES AND INTERSTATE COMMERCE COMMISSION.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

No. 436. Argued November 17, 1921.—Decided December 5, 1921.

1. Orders of the Interstate Commerce Commission may be set aside when based upon mistake of law. P. 256.

2. The Commission has power under § 1 of the Act to Regulate Commerce, as amended, to determine in particular cases whether the granting or withholding of a transit privilege is unreasonable and unjust, and to require its allowance or its withdrawal accordingly. So *held* of the privilege of "creosoting-in-transit," whereby forest products may be unloaded at an intermediate point, subjected to

the process of creosoting and forwarded on the original bill of lading to the destination therein named, without depriving the shipper of the benefit of through rates. .P. 257.

3. What Congress sought to prevent by § 3 of the Act to Regulate Commerce was not differences between localities in transportation rates, facilities and privileges, but unjust discrimination between them by the same carrier or carriers. P. 259.

4. Participation in joint rates does not make connecting carriers partners, and they can be held jointly and severally responsible for unjust discrimination only if each has participated in some way in that which causes it. P. 259.

5. Neither the Transportation Act of 1920, nor any earlier amendatory legislation, has changed, in this respect, the purpose or scope of § 3. P. 260.

6. Where the Commission found that denial of the creosoting privilege to a plant located at a point on the lines of certain carriers was not in itself unjust or unreasonable, but concluded that the plant suffered undue prejudice and disadvantage because they and other carriers before the Commission maintained joint rates, over routes passing through the point, in common with still other carriers, not parties, who had allowed the privilege to plants on their own lines as an item in their local tariffs and without the concurrence of the carriers before the Commission or participation by them in the revenues from the privilege, held, that the case was not remediable under § 3 of the Act to Regulate Commerce and that an order requiring the carriers proceeded against to remove the discrimination should be set aside. P. 257.

Reversed.

APPEAL from a decree of the District Court denying a preliminary injunction in a suit brought by the Central Railroad Company of New Jersey, the Pennsylvania Railroad Company, and twenty-one other railroad corporations, to set aside an order made by the Interstate Commerce Commission.

Mr. Henry Wolf Biklé and Mr. Alexander H. Elder, with whom Mr. Charles E. Miller was on the brief, for appellants.

A carrier is not chargeable with a violation of § 3 of the Interstate Commerce Act unless it participates in the

service which is claimed to cause the undue prejudice prohibited.

In other words, there is no infraction of the section unless a carrier, serving two shippers, treats them differently in respect to the service which it renders, without just cause.

The applicable portion of § 3 is the first paragraph (24 Stat. 380). Paragraph 3 very clearly does not apply to the present litigation. It will also be found that neither paragraph 2, nor paragraph 4, of § 3, has any application.

Section 15 is one of the jurisdictional sections of the act. It does not expand the duties and obligations which are devolved upon the carriers by the other sections, principally § § 1, 2, 3 and 4, but it establishes the power of the Commission to enforce these duties and obligations. As illustrated by the Tank Car Case, *United States* v. *Pennsylvania R. R. Co.*, 242 U. S. 208, carrier duties and commission power are not necessarily correlative.

Section 3 forbids any common carrier making or giving any undue or unreasonable preference or advantage to any particular person, or subjecting any particular person, etc., to undue or unreasonable prejudice or disadvantage. The prohibition against undue prejudice and disadvantage is the correlative of the prohibition against undue preference and advantage. The very word " preference " carries with it the thought of different treatment of two patrons by the same carrier. So also with respect to the words " advantage " or " disadvantage " and " prejudice," no carrier can create any advantage or disadvantage, or undue prejudice, unless, by its act, it places the one shipper in a more or less favorable position than it places the other. If this were not true the disadvantage, prejudice, etc., would arise not from its act, but from extraneous circumstances, with the result, illustrated in the case at bar, that a carrier would be required to accord a privilege,

found upon hearing not reasonably demandable as to that carrier, merely because some other carrier granted the privilege under circumstances not in proof.

The decisions hold that, if a given commodity may be shipped to a common destination from different points of origin via the lines of two different carriers, there is no violation of § 3 even though the rates may be on an entirely different basis, relatively, and even though the effect of such different bases of rates is practically to exclude the shippers located at one point of origin from the common market. *East Tennessee, &c. Ry. Co.* v. *Interstate Commerce Commission*, 181 U. S. 1, 18. The Interstate Commerce Commission, in many cases, has followed this construction of the act.

It is manifest that in the present case the Commission has made a new departure which it seeks to justify upon the provisions of the Transportation Act, 1920. But no change was effected by this act in the applicable portion of § 3 of the Interstate Commerce Act. The Commission makes the general statement that the Transportation Act has greatly enlarged its powers " and among other things we have been given authority to establish minimum rates." What connection exists between the minimum rates and § 3 is not disclosed.

The Interstate Commerce Act prescribes that a carrier party to a joint tariff must be shown as a participating carrier, (§ 6, par. 4, 34 Stat. 584). Clearly the law contemplates that a carrier shall not be regarded as participating in tariffs except when it is a party thereto.

While, when a joint through rate is established, it is ordinarily less than the sum of the combination of rates on some intermediate point, this is not a necessary feature of a joint rate, and, in fact, thousands of joint rates are the equivalent of the combination of so-called locals based on some intermediate point. In such a case, the handicap resulting to a shipper who does not have the

transit privilege, while it is accorded his competitor on another railroad participating in the transportation of the shipments, has no relation to the existence or non-existence of a joint rate. The disadvantage results from the establishment of the local privilege on the connecting line and the control of and responsibility for this rest alone with the railroad establishing it. The law requires the carriers to move the traffic, and no undue prejudice or discrimination can arise as a result of the service so rendered.

The Government and the Commission rely on the decision in *United States* v. *Louisville & Nashville R. R. Co.,* 235 U. S. 314. But, in that case this court did not sustain the Commission's finding under § 3 of the Interstate Commerce Act, but did uphold it under § 4. In this case there is no pretense that § 4 is involved, or violated.

The case at bar is different also from the other case in this court, relied on by the Government and the Commission,—*St. Louis Southwestern Ry. Co.* v. *United States,* 245 U. S. 136. The conclusive decision seems to be *Penn Refining Co.* v. *Western New York & Pennsylvania R. R. Co.,* 208 U. S. 208, 221.

An order of the Commission based solely upon a violation of § 3 must be in the alternative, leaving the carrier free either to extend the practice or privilege to the complaining patron or to withdraw it from all. The order in this case, although in form an alternative order, leaves no real alternative in fact and actual operation.

If § 3 were construed as the Commission has construed it in this case, it would be unconstitutional as violative of the due process clause of the Fifth Amendment.

*Mr. Blackburn Esterline,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck* was on the brief, for the United States.

Appellants concur with connecting lines in publishing tariffs of through routes and joint rates. Presumably they

do that for the benefits and advantages they derive there-from. In order to reap the rewards which flow from the Interstate Commerce Acts with solidarity they stand united. They should be gauged in that way, and not disconnectedly, when injury results in applying those rates. To hold that single companies by specific acts may at favored places and in selected instances break that unification and solidarity, to the advantage of shippers at those favored places and to the undue prejudice of other shippers at unfavored places, is to annihilate the statute.

As the Commission drew the order in the alternative, it may be assumed that it will accept compliance by allowing either the withdrawal of the appellants from the through routes and joint rates or the installation of creosoting-in-transit at Newark. *Great Northern Ry. Co.* v. *Minnesota*, 238 U. S. 340. Distinguishing *Penn Refining Co.* v. *Western New York & Pennsylvania R. R. Co.*, 208 U. S. 208; and *Philadelphia & Reading Ry. Co.* v. *United States*, 240 U. S. 334. Counsel fail in their endeavor to distinguish *St. Louis Southwestern Ry. Co.* v. *United States*, 245 U. S. 136.

*Mr. Walter McFarland,* with whom *Mr. P. J. Farrell* was on the brief, for the Interstate Commerce Commission.

What amounts to undue preference or prejudice is a question not of law, but of fact, with which the Commission was created to deal. *United States* v. *Louisville & Nashville R. R. Co.*, 235 U. S. 314, 320; *Pennsylvania Co.* v. *United States,* 236 U. S. 351, 361; *Interstate Commerce Commission* v. *Delaware, Lackawanna & Western R. R. Co.*, 220 U. S. 235, 255.

Appellants can comply with the order by pursuing any one of the following courses: (*a*) Establish the transit service at Newark; (*b*) cancel their participation in the joint rates through Newark; or (*c*) qualify their concur-

rence in such rates to joint rates through Newark in connection with which transit service is not accorded at any point on the through route.

They are the principal carriers in trunk line and New England rate territories, and without their coöperation it would be impossible to subject the American Creosoting Company at Newark to undue prejudice.

The fact that a carrier has a certain policy can have no bearing upon its duty to obey the statute and lawful orders.

While it is true that appellants do not publish the transit services accorded to the favored competitors, it is equally true that their partners in the joint through rates do publish them and that by continuing to participate in the joint through rates appellants have made possible, and have made themselves effective instrumentalities in the execution of, the undue prejudice condemned by the Commission. *Houston, East & West Texas Ry. Co.* v. *United States,* 234 U. S. 342, 356; *Interstate Commerce Commission* v. *Chicago, Rock Island & Pacific Ry. Co.,* 218 U. S. 88, 102, 103. *St. Louis Southwestern Ry. Co.* v. *United States,* 245 U. S. 136, is controlling in principle.

Mr. Justice Brandeis delivered the opinion of the court.

This suit was brought in the Federal District Court for New Jersey to enjoin the enforcement of an order of the Interstate Commerce Commission on the ground that it exceeds the powers of the Commission, was arbitrary and is void. The plaintiffs were the Central Railroad of New Jersey, the Pennsylvania, and twenty-one other railroads located in Trunk Line territory and New England. The defendants were the United States and the Interstate Commerce Commission. The former filed a motion to dismiss; the latter an answer which admitted the material allegations of the bill of complaint. On these pleadings

the case was heard before three judges on an application for a preliminary injunction. This was denied without written opinion; and the case is here on appeal under the Act of October 22, 1913, c. 32, 38 Stat. 208, 220.

The order of the Commission was entered upon a petition of the American Creosoting Company to which these twenty-three carriers—and no others [1]—were made respondents. *American Creosoting Co.* v. *Director General,* 61 I. C. C. 145. It alleged that the petitioner had a creosoting plant at Newark, New Jersey, which was connected by switch tracks with the Central and the Pennsylvania; that these carriers had failed to establish there the privilege known as creosoting-in-transit; that this failure was unjust and unreasonable in violation of § 1 of the Act to Regulate Commerce of February 4, 1887, as amended; and that it was also unjustly discriminatory in violation of § 3. The Commission found that failure to establish this transit privilege was not unjust or unreasonable and denied relief under § 1. But it found on the facts hereinafter stated that this failure subjected the company to unjust discrimination; and, granting relief under § 3, the Commission directed that the discrimination be removed by the respondents, who are the appellants here.

By the privilege called creosoting-in-transit, forest products received for shipment may be stopped and unloaded at an intermediate point, there subjected to the process of creosoting, and later forwarded on the original bill of lading to the destination therein named. Where the privilege is granted and availed of, delivery is made of the commodity to the creosoting plant, as if that were the final destination. It is there unloaded and treated;

---

[1] Except the New York, Ontario and Western Railway Company, another carrier in the Trunk Line territory, whose interests were presumably not affected by the order. The number of carriers is, therefore, referred to herein as being twenty-three.

and at some time thereafter it is redelivered to the carrier, as if there were an initial shipment of the creosoted product. Then it is forwarded to the final destination. Although some charge is made for the transit service, the shipper secures thereby a lower freight rate. For through rates are generally much less than the rate on the untreated forest product from point of origin to the transit point plus that on the treated product from there to destination.

The plant of the American Creosoting Company is not reached by lines of any of the twenty-three appellants except the Central and the Pennsylvania. Neither of these two carriers accords the creosoting-in-transit privilege at any point on its lines; and no competitor of the company has a plant on those of either. Nor is the privilege granted in Trunk Line territory by any carrier, with a single exception not here material. Some competitors of the American Creosoting Company have plants in Mississippi, Indiana, Illinois, Ohio and Pennsylvania; and the several railroads on which these plants are located have, each acting independently, established the privilege at the places where those plants are situated. Under the rules of the Commission governing the making, filing and publishing of tariffs, privileges like creosoting-in-transit are treated as a matter local to the railroad on which the transit point is situated. Whether the privilege shall be granted or withheld is determined by the local carrier. If granted, the local carrier determines the conditions; and these are set forth in the local tariff. Although a joint through route with joint rates is established by concurrent action of several carriers, the transit privilege may thus be granted by a carrier without the consent of, and without consulting, connecting carriers. And the whole revenue received for use of the privilege is retained by the local carrier. The appellants did not participate in any way in establishing the transit privileges enjoyed by

competitors of the Newark concern on lines of the southern and midwestern carriers; and none of those carriers is controlled by any of the appellants. But appellants did join with those southern and midwest railroads in establishing joint rates on forest products over routes which pass through the points at which this privilege prevails and also through Newark.[1]

The order entered by the Commission declares that the twenty-three carriers " in so far as they respectively participate in tariffs carrying joint rates " on these forest products " through Newark . . . from points in southern classification territory to points in northern New Jersey, eastern New York, and in New England " subject the American Creosoting Company to undue prejudice and disadvantage; and it directs these twenty-three carriers to avoid this undue prejudice. How the discrimination shall be removed is not prescribed. In effect the order directs that unless the Central and the Pennsylvania establish the privilege at Newark, the twenty-three carriers must withdraw from all tariffs establishing the joint rates. As to administrative orders operating *in futuro,* the Commission's findings of fact are conclusive, subject to qualifications here not pertinent; and a finding that the discrimination is unjust is ordinarily a finding of fact. *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457, 481, 482. But the question presented here is whether the discrimination found can be held in law to be attributable to the appellants, and whether they can be required to cancel existing joint rates, unless it is removed. No finding made by the Commission can pre-

---

[1] The transit privilege so granted includes cutting of paving blocks into shape at creosoting plant. On some of the railroads the joint rates do not apply through the transit point. On them the privilege includes an out-of-line movement and on some lines also a back haul to reach final destination. This broadened privilege was sought for Newark.

vent the review of such questions. *Interstate Commerce Commission* v. *Diffenbaugh,* 222 U. S. 42; *Philadelphia & Reading Ry. Co.* v. *United States,* 240 U. S. 334.

Creosoting-in-transit, like other transit privileges, rests upon the fiction that the incoming and the outgoing transportation services, which are in fact distinct, constitute a continuous shipment of the identical article from point of origin to final destination. The practice has its origin partly in local needs, partly in the competition of carriers for business. The practice is sometimes beneficial in its results; but it is open to grave abuses.[1] To police it adequately is difficult and expensive. Unless adequately policed, it is an avenue to illegal rebates and seriously depletes the carriers' revenues. Railroad managers differ widely as to the policy of granting such privileges. The Commission clearly has power under § 1 of the Act to Regulate Commerce as amended to determine whether in a particular case a transit privilege should be granted or should be withdrawn. For that section requires, among other things, that carriers establish, in connection with through routes and joint rates, reasonable rules and regulations. The Commission might, therefore, acting under § 1, have directed the Central and the Pennsylvania to establish the creosoting-in-transit practice at Newark, if it deemed failure to do so unreasonable or unjust; or it might, in an appropriate proceeding, have directed the southern and midwestern carriers to discontinue the practice on their lines, if it deemed the granting of the privilege to be unreasonable or unjust. But it did neither. Instead it sought to accomplish by indirection either one result or the other and ordered under § 3 that the discrimination found to exist be removed. Twenty-one of the appellants are powerless either to cause the Central

---

[1] See *In Matter of Alleged Unlawful Rates and Practices,* 7 I. C. C. 240; *In Matter of Substitution of Tonnage at Transit Points,* 18 I. C. C. 280; *The Transit Case,* 24 I. C. C. 340.

and the Pennsylvania to instal the privilege at Newark
or to cause the southern and midwestern carriers to dis-
continue the practice on their lines. The Central and
the Pennsylvania are likewise powerless to cause these
connecting carriers to withdraw the privilege. They can,
it is true, equalize conditions by establishing the privilege
at Newark. But to do so would involve departure from
a policy to which they have steadfastly adhered and ad-
hesion to which was held by the Commission not to be
unreasonable. If they should establish the privilege at
Newark, they would act contrary to their judgment and
would adopt a practice which some connecting carriers
had introduced without their concurrence or consent, and
which may hereafter, upon appropriate enquiry, be held
by the Commission to be unjust and unreasonable. Con-
gress could not have intended that under such circum-
stances relief should be afforded under § 3, when a direct
remedy is available under § 1.

It is insisted that the order leaves appellants the al-
ternative of withdrawing from the tariffs which establish
joint rates with the southern and midwestern carriers
through Newark. The order does not so provide in terms;
and in fact the alleged alternative is illusory. The undue
prejudice found arises not from the existence of joint
rates, but from conditions local to other railroads. Can-
cellation of the joint rates would not change those condi-
tions. Although the joint rates were withdrawn, the
established through routes would remain. The duty to
provide such routes is specifically enjoined by paragraph
4 of § 1; and, under the provisions of paragraph 1 of § 6,
the separately established rates of the several connecting
carriers would, in the absence of joint rates, apply to
through transportation. So far as appears the Newark
concern would be under the same disadvantage as com-
pared with its competitors, whether the traffic moved on
the combination of the rates local to the several lines or

on joint rates. Even the abolition of the through routes (which is not suggested) would leave the relative positions of the several creosoting concerns unchanged. Cancellation of the joint rates would, at most, relieve appellants from the charge that they are violating the provisions of § 3.

It is urged that, while the undue prejudice found results directly from the individual acts of southern and midwestern carriers in granting the privilege locally, the appellants, as their partners, make the prejudice possible by becoming the instruments through which it is applied. Discrimination may, of course, be practiced by a combination of connecting carriers as well as by an individual railroad; and the Commission has ample power under § 3 to remove discrimination so practiced. See *St. Louis Southwestern Ry. Co.* v. *United States,* 245 U. S. 136, 144. But participation merely in joint rates does not make connecting carriers partners. They can be held jointly and severally responsible for unjust discrimination only if each carrier has participated in some way in that which causes the unjust discrimination; as where a lower joint rate is given to one locality than to another similarly situated. *Penn Refining Co.* v. *Western New York & Pennsylvania R. R. Co.,* 208 U. S. 208, 221, 222, 225. Compare *East Tennessee, Virginia & Georgia Ry. Co.* v. *Interstate Commerce Commission,* 181 U. S. 1, 18. If this were not so, the legality or illegality of a carrier's practice would depend, not on its own act, but on the acts of its connecting carriers. If that rule should prevail, only uniformity in local privileges and practices or the cancellation of all joint rates could afford to carriers the assurance that they were not in some way violating the provisions of § 3. What Congress sought to prevent by that section, as originally enacted, was not differences between localities in transportation rates, facilities and privileges, but unjust discrimination between them by the

6267°—22——22

same carrier or carriers.   Neither the Transportation Act 1920, February 28, 1920, c. 91, 41 Stat. 456, nor any earlier amendatory legislation has changed, in this respect, ·the purpose or scope of § 3.

*Reversed.*