## UTAH POULTRY PRODUCERS CO-OP. v. UNION PAC. R. CO.

No. 3069.

Circuit Court of Appeals, Tenth Circuit.

March 7, 1945.

Elias Hansen, of Salt Lake City, Utah (Harry D. Pugsley, of Salt Lake City, Utah, on the brief), for appellant.

W. Hal Farr, of Salt Lake City, Utah (H. B. Thompson, Robt. B. Porter, and Bryan P. Leverich, all of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This action was brought by the Union Pacific Railroad Company[1] against the Utah Poultry Producers Association[2] to recover for freight under-charges. Judgment was entered for the Railroad and the Association has appealed. The decision turns upon an interpretation of Union Pacific Tariff No. 7183, I.C.C. No. 4549. The facts are these:

The Association is engaged in business in Salt Lake City, Utah. It purchases eggs in the outlying territory in Utah and Idaho. These eggs are transported to the Association's place of business in Salt Lake City over the Railroad's lines over the lines of the Salt Lake and Utah Railroad, and by truck. There they are unloaded, candled, graded, and stored. Some of the eggs are sold on the local market and the rest are reshipped to New York, New Jersey, and other distant points. The tariff in question grants transit privileges. It provides that eggs may be stopped in transit not to exceed three times, and for a period of time not exceeding twelve months. In those instances where the transit privileges are exercised, the shipper pays the local rate from point of origin to Salt Lake City, for which a credit slip is issued. When the eggs are reshipped, the through rate is paid and the credit slip issued for the payment of the local rate into Salt Lake City is used in part payment thereof.

The controversy centers around the use of these credit slips. It arises by virtue of these two facts: The credit slips have different values, depending upon the point of origin of the shipment of the eggs, and not all of the eggs that are shipped into Salt Lake City are reshipped on the through rate. It is of course obvious that if all of the eggs received were reshipped on the through rate, credit slips could be used indiscriminately without injury to the integrity of the through rate. But when a large number of eggs are sold on the local market, it follows that when all the remaining eggs have been reshipped to their ultimate destination, the shipper will have on

---

[1] Herein called the Railroad.

[2] Herein called the Association.

hand a considerable number of these credit slips which must then be surrendered.

The Association contends that it has the right to use and receive credit for the full value of credit slips surrendered in payment of freight charges out of Salt Lake City irrespective of whether the credit slips were issued for the particular eggs shipped or for eggs brought into Salt Lake City from a comparable local freight point. The Railroad, on the other hand, contends that credit slips must be used in connection with the reshipment of the particular eggs for which they were issued or in connection with the reshipment of eggs which have a comparable local freight rate into Salt Lake City.

Permitting the shipper to use credit slips indiscriminately when part of the eggs are sold locally is obviously advantageous to it. To illustrate: The local rate on eggs from Preston, Idaho, to Salt Lake City was 57 cents per hundred-weight, while the local rate from Midvale to Salt Lake City was 9½ cents. Assuming that 25% of the eggs on hand came from Midvale and that 25% of all eggs on hand were sold locally, the shipper would naturally use the 57 cent credit slips in payment of the freight on all eggs reshipped and would then surrender for cancellation all of the 9½ cent credit slips.

The trial court in its findings adopted the views of the Railroad. It found that the Association had violated the provisions of the tariff; that in reshipping eggs from Salt Lake City it had substituted eggs which did not originate on the lines of the Railroad, or which originated in a territory where a lower local freight rate applied than the rate for the territory for which the credit slips were issued which were tendered in payment of the freight on the shipment. The right to tender payment by credit slips for the part of the shipment so substituted was denied, and judgment was entered accordingly.

Under the rules of the Interstate Commerce Commission governing the making, filing and publishing of tariffs, transit privileges are treated as a matter local to the railroad on which the transit point is situated. The local carrier determines both whether the privilege shall be granted and the condition under which it may

be exercised. See Central R. Co. of New Jersey v. U.S., 257 U.S. 247, 42 S.Ct. 80, 66 L.Ed. 217. It follows that the tariff granting transit privileges determines the nature of the rights conferred thereby and that when the character and extent of these rights come into question we must seek the answer within the four corners of the published tariff itself.

The pertinent provisions of the tariff in question in substance, are that butter, eggs, cheese, and chickens originating on or via the Union Pacific might be stopped in transit not to exceed three times, for the purpose of processing, sorting, storing, etc., without impairment of the integrity of the through rate; that the agent must show on the freight bill the actual weight, as well as the weight upon which freight charges were actually paid; that the shipper must present the freight bills within thirty days for recording and for the issuance of credit slips; that transit privileges would be allowed on out-bound weight equal to actual in-bound weight, less shrinkage or loss in handling; that contents of one or more cars from the same or different points of origin into transit point might be billed therefrom in one or more carloads and vice versa; that the minimum weight might be made up entirely of transited articles or of mixed loads containing some non-transited articles; that refunds on transit credits would be given only on the actual weight of the transit portion reshipped.

The tariff further provided that transit privileges would be accorded only to those shippers who kept an accurate record of the transit and non-transit tonnage received and forwarded, who made an annual report showing the quantity of each commodity on hand and the quantity of each product entitled to transit privileges as represented by unpaid freight bills and credit slips on hand. The shipper was required to permit inspection of its records to determine their accuracy.

When a shipment is stopped in transit and is subsequently reshipped to its ultimate destination, there are in fact two separate, distinct transportation services. Transit privileges rest upon the fiction that these two distinct transportations constitute a continuous shipment of an identical article from point of origin to the point of ultimate destination.[3]

---

3 Central R. Co. of New Jersey v. United States, 257 U.S. 247, 42 S.Ct. 80, 66 L.Ed. 217; Chicago, B. & Q. R. Co. v. E. Bernier & Sons, D.C., 56 F.Supp. 691; The Transit Case 1912, 24 I.C.C. 340.

■ Transit privileges grant special concessions to a shipper. In permitting them, the Interstate Commerce Commission has been zealous in protecting the integrity of the through rate. It is made plain in all its decisions that unless such privileges are carefully circumscribed, they permit opening the doors to discrimination and thus tend to destroy the integrity of the through rate. While transit privileges are justified solely on the theory that the identical article or its exact equivalent or its product is finally shipped to the ultimate destination, some substitution is permitted under carefully formulated rules and regulations.[4] Where substitution has been permitted, it has been of a similar article from the same or a comparable rate point.[5] In this way, the integrity of the through rate is preserved, and discrimination and unfair trade practices are prevented.

A careful analysis of the tariff under consideration leads us to conclude that it is intended to be in full compliance with the well established policies of the Interstate Commerce Commission which contemplates that credit slips shall be used in connection with the reshipment of the eggs for which the slips were issued, or in connection with the reshipment of a like quantity of eggs from a comparable local rate point. To do otherwise would destroy the integrity of the through rate and would open wide the doors to discrimination in the transportation of goods. To adopt the theory of the Association would permit it to obtain credit slips for eggs that came into its warehouse at Salt Lake City over the Railroad's lines, on the theory that such eggs would be reshipped, sell the eggs on the local market, and reship eggs which came in by truck, and use the credit slips in future payment of the freight thereon. This would utterly destroy the principle of the through rate and the fundamental theory of a transit rate. Such a reshipment would bear no relation to the inbound shipment stopped temporarily in transit.

■ The Association complains that if it is required to store eggs for which credit slips having a certain value have been issued, separate and apart from eggs for which credit slips having a different value have been issued, it will make its operation so expensive that it will destroy the value of the transit privilege. We do not understand that the Railroad contends that the eggs from each local freight point must be kept separate from all other eggs. It contends that credit slips can be used only in connection with the reshipment of eggs for which they were issued or for eggs coming from a comparable local rate point. In this, we think it is correct.

It may be that the Association could store in a common mass all the eggs it had for reshipment, so long as it kept correct and accurate records of the quantity of eggs therein from each separate local freight point, and caused the portion of credit slips represented by the eggs that were segregated for local sale to be canceled. But it is not necessary for us to decide this, because this is not the issue as framed by the parties. The Association claims the right to use these credit slips indiscriminately without regard to where the eggs came from that are reshipped, and this it may not do.

Affirmed.

---

[4] I.C.C. Rule 76, Transit Circular 17(a), 18 I.C.C. 280, 24 I.C.C. 340, 26 I.C.C. 204.

[5] Armour & Co. v. Delaware, L. & W. R. Co., 101 I.C.C. 337.