**UNION PACIFIC RAILROAD COMPANY, Plaintiff,**

v.

**BARTLETT & COMPANY, GRAIN, Defendant (two cases).**

**Nos. 19741–1, 73 CV 293–W–1.**

United States District Court, W. D. Missouri, W. D.

May 8, 1975.

**1348**

Michael W. Lerner, Stinson, Mag. Thomson, McEvers & Fizzell, Kansas City, Mo., for plaintiff.

Charles E. Patterson, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for defendant.

MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

These jury-waived cases involve actions brought by plaintiff railroad pursuant to 28 U.S.C.A. § 1337 to collect certain unpaid demurrage charges allegedly owned by the defendant grain company. Counsel, with highly commendable cooperation, have agreed to extensive factual stipulations dealing with the complex issues involved herein. We adopt those stipulations by this reference as part of our findings of fact. Additional findings will be made in the course of this memorandum opinion, all of which shall constitute additional findings of fact and conclusions of law in accordance with F.R.Civ.P. 52.

## I.

The general factual circumstances of each of these cases may be briefly summarized. Both cases involve deliveries by plaintiff of loaded grain cars to defendant's River Rail Elevator in Kansas City, Kansas, located adjacent to plaintiff's so-called Fairfax Yard. Under the applicable tariff agreement, B. B. Maurer's Freight Tariff 4–I, defendant had forty-eight hours of "free-time" for unloading each car after it was "placed" on the siding designated by the defendant. Often times, when cars consigned to the defendant reached the Yard defendant's siding would already be filled to capacity. In such situations, Rule 5–A–1 of the tariff provided that:

> When delivery of a car . . . cannot be made on account of the inability of consignee to receive it or because of any other condition attributable to the consignee, such car will be held at destination, or, if it cannot reasonably be accommodated there, at an available hold point, notice shall be sent or given the consignee in writing or, in lieu thereof, as otherwise agreed to in writing, that the car is held and that this railroad is unable to make delivery. This will be considered constructive placement.

If cars were detained for more than forty-eight hours after actual or constructive placement, the tariff provides that plaintiff can collect a further surcharge called "demurrage." The present actions involve claims by plaintiff for $10,480.00 and $5,880.00 in such demurrage charges, for the period from October 25, 1968 to January 9, 1969, and from April 24, 1970 to May 13, 1970, respectively.

Defendant does not deny that it failed to unload cars consigned to it within forty-eight hours of constructive placement. But defendant does contend that this delay was caused by plaintiff's failure to fill defendant's siding with cars, thereby making it impossible for defendant to complete its unloading within the free time. Specifically, defendant alleges that plaintiff was under "duty to provide two switches per day to defendant's River Rail Elevator." This duty required plaintiff "to fill defendant's south tracks with as many cars as those tracks would hold at each switch," and "to so fill those south tracks within the time it usually had done so according to the practice which had developed between the parties."

Defendant argues that plaintiff failed to meet its obligations in this regard, and therefore no demurrage charges may properly be assessed.

## II.

Plaintiff initially argues that, as a matter of law, defendant cannot prevail on its defenses. It is argued that plaintiff was under no duty to provide two switches at certain times during the day since, even if a practice to this effect had developed between the parties, it could not be binding on plaintiff. This argument is based on plaintiff's contention that the development of routine switching schedule would violate Section 3(1) of the Interstate Commerce Act, 49 U.S.C.A. § 3(1), which states in part that:

> It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation . . . .

■ Plaintiff's contention is not tenable. The purpose of Congress in enacting Section 3 was to prevent unjust discrimination between various shippers. See Central Railroad Co. v. United States, 257 U.S. 247, 42 S.Ct. 80, 66 L. Ed. 217 (1921). Thus, a contract by a carrier to furnish cars to a customer at a specific time is void in the absence of a specific tariff provision providing for such service. A contrary holding would allow railroads to extend particularly advantageous services to certain shippers while denying them to other, less favored, competitors. See Consumers Mu-

tual Oil Co. v. Schaff, 59 F.2d 730 (7th Cir. 1932).

But these provisions do not prohibit railroads and shippers from arranging work schedules compatible with the needs of both parties, so long as the rights of other shippers are not prejudiced. Section 1(11) of the Act, 49 U.S. C.A. § 1(11) provides:

It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful.

Section 1(10) of the Act further provides:

The term "car service" in this chapter shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter.

These provisions indicate that Congress anticipated that railroads would establish orderly procedures for providing services to their customers, including mutually agreeable schedules for switching services in situations such as presented by this case. Section 3 was designed not to prohibit such practices, but rather to insure that they were carried on in a non-discriminatory manner.[1]

### III.

Plaintiff also argues that this Court must find in its favor as a matter of law

since "the applicable tariff does not provide for the reduction of detention charges because of irregular or delayed switching and, therefore, no reduction can be made."

■ In answer to this argument defendant points to Rule 8–E–1 of the tariff, which provides in part that:

SECTION E.—Error of any railroad named in the bill of lading contract or participating in the transportation transaction, which prevents acceptance, proper tender or delivery

1. Under this Rule, demurrage will be charged on the basis of the amount that would have accrued but for such error.

Defendant's reliance on this Rule is misplaced. The term "error," as used in Rule 8–E–1, does not include failures by the railroad to provide switching services in accordance with a predetermined schedule. Instead, the Rule is applicable to actual switching mistakes, such as "run-arounds,"[2] or the placement of cars of another shipper on the defendant's siding. See National Trucking & Storage Co. v. Pennsylvania Railroad Co., 270 I.C.C. 539 (1948), modified 277 I.C. C. 109 (1950), modified 283 I.C.C. 395 (1951), affirmed in part and reversed in part, 228 F.2d 23 (1955).

But this finding does not mean that a consignee has no defense in an action to collect demurrage charges caused by the failure of a railroad to provide timely switching services. In Union Bag & Paper Corp. v. Director General, 61 I.C.C. 424 (1921), the Interstate Commerce Commission was faced with a claim by a consignee for a refund of demurrage charges, allegedly resulting from the railroad's failure to place cars for un-

---

1. It should be pointed out that we need not reach the question of whether there was an actual "contract" or "agreement" between the parties that this schedule be maintained. As noted above, Section 1(11) of the Act provides that railroads have a duty to estab-

lish reasonable practices with respect to car services. These practices are standards of performance upon which the railroad's customers may rely.

2. "Run-arounds" are cars not placed in the order of their arrival.

loading by the consignee's crews.[3] In discussing the principles to be applied, the Commission stated that:

Unless actual tender of cars is made or the consignee has informed the carrier that no more cars can be received, the rule requires the carrier in fact to place cars to the full extent of the consignee's physical capacity to receive them. The carrier under its rule must place cars constructively only because of the act or neglect of the consignee or the inability of the latter to receive them. In the instant case there was no actual tender; and complainant did not inform defendant that no more cars could be received. Defendant, before making constructive placement of cars, should have placed at complainant's disposal all the cars which complainant's sidings would hold. If complainant could on any day have received more cars than were delivered by defendant the demurrage debits and the resulting charges must be adjusted accordingly; but as delivery was made daily over an extended period, complainant should show that it could have unloaded more cars daily had they been actually instead of constructively placed. [61 I.C.C. at 426]

Applying those principles to the facts of that case, the Commission found that a fire at the consignee's facilities made it impossible for the consignee to unload more cars from August 1 to August 9, 1918. Subsequent to that time, however, conditions at the plant "were again normal." Since, during July of that year the consignee had unloaded an average of 55 cars per day, the Commission initially concluded that:

The demurrage charges collected on all other cars embraced in the issues were unlawful to the extent that the charges collected exceeded those that would have accrued had cars been delivered at the rate of 55 cars per day for the period subsequent to August 9. [Id. at 431]

Upon petition for reconsideration, however, the Commission amended these findings. Union Bag & Paper Corp. v. Director General, 69 I.C.C. 711 (1922). It noted that its statement of general principles was intended to emphasize:

The seriousness of the duty devolving on the carrier under the constructive-placement provision to see that no cars are placed constructively unless there is an actual disability on the part of the consignee to receive them.

Considerations of fairness therefore required that if:

the evidence shows that the complainant could have received and unloaded more cars had they been actually instead of constructively placed, it follows that the demurrage debits and the resulting charges must be adjusted accordingly.

The Commission therefore concluded that:

In the light of the foregoing principles two issues of fact are raised: First, was it possible for defendant to have placed more cars for unloading than were placed; second, if more cars could have been placed, does the evidence show that complainant would have unloaded more cars had they been placed actually instead of constructively. [69 I.C.C. at 714]

The Commission found that the evidence supported the consignee's contention that track space was available after August 9 for the railroad to have placed more cars. But on the issue of the consignee's ability to unload, the Commission reversed its prior holding and found for the railroad, stating that the consignee's:

present contention is inconsistent with its actual performance under circumstances which should have spurred it to use its unloading facilities to the utmost. . . . If complainant during the month of August had request-

3. Several other railroad errors were urged in the *Union Bag* case, none of which are important for our purposes.

ed delivery of additional cars, its conduct then would have been more in consonance with its present contention. On the contrary, when its representatives were told of the large accumulation of cars they responded that they were doing the best they could in the matter of unloading. Moreover, complainant held over from day to day cars upon which demurrage was running. After all, the issue resolves itself into a question of whether the failure of defendant actually to place more cars was the proximate cause of the demurrage accruing. Having received information daily as to the large accumulation of cars and with knowledge that large amounts of demurrage charges were accruing, it is inconceivable that complainant, if it had additional unloading capacity, would not have taken steps to secure delivery of additional cars.

The Commission accordingly amended its order to deny the consignee any refund for the dates in question.

Defendant in this case, however, argues that a different rule was adopted by the Commission in a later series of opinions in National Trucking & Storage Co. v. Pennsylvania Railroad Co., *supra*. That contention is not tenable. In *National Trucking*, the complainant-consignee sought a refund on demurrage charges allegedly resulting from "defendant's failure to perform adequate switching service to and from its warehouse." The defendant railroad admitted that the consignee's siding was not always filled at the usual switching time. It argued, however, that the evidence showed that the consignee could not have unloaded more cars had they been placed and that, under the rationale of *Union Bag:*

It is the ability of a consignee to unload cars already placed upon its siding, rather than the capacity of the siding, which determines whether cars may be held under constructive placement and demurrage charged for their detention while so held. [270 I.C.C. 539, 543–544 (1948)]

The Commission agreed that *Union Bag* stated the controlling law, but concluded that *National Trucking* should be distinguished on its facts. It found that while the evidence in *Union Bag* "established that the complainant would not have unloaded those cars had they been placed actually rather than constructively," the evidence in *National Trucking* demonstrates that "complainant's unloading force was at times idle owing to the lack of cars in place for unloading." The Commission therefore concluded that "complainant would have unloaded more cars had such cars been placed actually instead of constructively," and accordingly ordered that the resulting demurrage charges be refunded. [Id. at 544–45]

It is apparent from the foregoing that the Commission held in *National Trucking* that it was merely following and applying the principles first set forth in *Union Bag*. The defendant consignee in this case, however, argues that *National Trucking* holds that a consignee may merely show that its tracks were not filled during its usual switching times, thereby shifting to the plaintiff "the burden of establishing that such errors on its part did not subject defendant to additional demurrage charges." In support of this contention, plaintiff relies on the Commission's statement that:

In a situation such as is here present, it is the primary duty of the carrier to place cars, on which demurrage time is running, upon the consignee's siding whenever, during the ordinary and usual switching time of that area, space for such placement is available. If space is available and no car is placed thereon during the ordinary and usual switching time of the district, we think it incumbent upon the defendant to affirmatively establish that such failure on its part did not subject the consignee to additional demurrage charges. [Id. at 544]

We find and conclude that this general statement does not signal any departure from the clear holding and rule of *Union Bag*. In the first place, defendant's reading of this passage is contrary to the actual holding in *National Trucking*, as discussed above. More fundamentally, it is based upon the erroneous assumption that space is "available" whenever there are open tracks upon which cars could be placed. As the Commission pointed out in *Union Bag*, "availability" means more than mere physical capacity. Instead it noted that a consignee's "available trackage space for receiving cars . . . of necessity has to be measured *by its ability to unload cars*." [69 I.C.C. at 713 (emphasis ours)]. There is no indication whatever in *National Trucking* that the Commission intended to depart from this principle.

This conclusion is reinforced by the Commission's subsequent opinion in Triangle Grain Co. v. Pacific Electric Railway Co., 273 I.C.C. 403 (1948). The Commission in that case found that the railroad had failed to switch cars when it was physically possible to place additional cars on consignee's track. It further found that the railroad had frequently called the consignee's attention to the length of time during which some cars had been held on constructive placement that urged it to unload them first. The consignee, however, continued to unload based upon their need for a particular commodity. The Commission concluded that:

It does not appear, therefore, that the unloading of any of these constructively placed cars would have been expedited had their actual placement occurred earlier than it did. In such circumstances, the capacity of the track is of no importance. Upson Co. v. Erie R. Co. 69 I.C.C. 483; Union Bag & Paper Corp. v. Director General, 69 I.C.C. 711. [273 I.C.C. at 408]

The rationale of the *Union Bag*, *National Trucking* and *Triangle Grain* cases is clear. Each of those cases recognized that a consignee may avoid demurrage charges resulting from delay occasioned by the railroad's failure to switch in accordance with normal procedures. But in order to avoid such charges the consignee must show that during the ordinary and usual switching time for the consignee's facilities:

(a) there was sufficient capacity on the consignee's siding for additional cars;

(b) the consignee had the actual ability to have unloaded the additional cars had they been placed on its siding; and

(c) the railroad failed to place sufficient cars on the consignee's siding, even though other cars were being held on constructive placement and were available for unloading.[4]

### IV.

Upon the factual circumstances of the record in the present case, we find and conclude that defendant has failed to produce sufficient evidence to establish its defense to plaintiff's claim for demurrage.

### A.

As noted above defendant alleges that plaintiff was under duty to provide two switches per day at its River Rail Eleva-

---

4. Plaintiff railroad argues in its brief that a consignee must also prove "culpable negligent action or inaction" on the part of the railroad in order to avoid demurrage charges. We disagree. It may be that in an action by a consignee to recover damages from a railroad for failure to provide proper switching services, some element of "culpability" on the part of the railroad must be shown. But we need not reach that question since demurrage cases do not involve the assessment of any damages whatever against the railroad. Instead, the issue in a demurrage action is whether a *consignee* must pay assessments resulting from the railroad's failure to provide service. In this situation the "culpability" of the railroad is irrelevant.

tor. One of these switches was the "evening" switch which would normally be completed by 7:00 a. m. each morning. The second or "mid-day" switch usually occurred between 11:30 a. m. and 12:30 p. m. each day. Defendant alleges that on certain enumerated days, plaintiff failed to provide one or both of those switches.[5]

It is stipulated that the capacity of the defendant's siding was from twenty-seven to thirty cars, depending on the actual size of the cars. It is further stipulated from plaintiff's own yard checks that at 7:00 a. m. on each morning in question, the number of cars placed on defendant's siding was as follows:

| | | |
|---|---|---|
| October 30, 1968 | 22 | cars |
| November 4, 1968 | 19 | " |
| December 27, 1968 | 17 | " |
| January 8, 1969 | 22 | " |
| April 24, 1970 | 24 | " |
| April 27, 1970 | 18 | " |
| May 5, 1970 | 22 | " [6] |

We accordingly find that for these dates, the defendant did have capacity on its siding for the placement of additional cars during the "evening" switch.

The bulk of defendant's arguments, however, deal with alleged failures by the plaintiff to fill tracks during the "mid-day" switch. In these situations there is no yard check or other record stating the number of cars on the defendant's siding either before, during, or after the usual and ordinary time for that switch. Defendant instead relies upon inferences which it argues may be drawn from various other records and documents kept by the plaintiff. After a careful review of the records presented, we find and conclude that the proof adduced by defendant with regard to the "mid-day" switches is insufficient to support a finding that defendant's siding had capacity for additional cars which the plaintiff failed to fill.

The pattern of proof adduced by defendant may be illustrated by reference to October 25, 1968. It is stipulated that at 7:00 on that date, plaintiff's yard check found twenty-seven cars actually placed on defendant's siding, ready for unloading. It is further undisputed that by the end of the day twenty-five cars had been unloaded and one fifty-foot boxcar "run-by."[7] Plaintiff's Form 4625 lists twenty-six cars as "released" by defendant at 11:00 a. m. on October 25, including the twenty-five unloaded cars and, for reasons unexplained by either party, the remaining loaded car. Moreover, the Form does not show, though space is provided, that any cars were placed at mid-day even though a substantial number were on constructive placement. Based upon this evidence, defendant suggests the Court find that:

> Since all cars other than the 50-foot run-by were released at mid-day, defendant must have unloaded all cars available in the morning, prior to the mid-day switch, and, therefore, received no cars at the mid-day switch. No cars were placed at the mid-day switch.

It is apparent that the linchpin of defendant's argument is the information contained on Form 4625. Unfortunately for the defendant, the evidence adduced at trial shows, and we accordingly find, that this information is inherently unre-

5. The various briefs of the parties discuss in detail the proper characterization of this scheme, whether it was agreed to by the parties, and the nature of the obligation imposed on the railroad. Inasmuch as we find that defendant has failed to prove other necessary elements of its defense, we need not reach these questions.

6. Although plaintiff has stipulated that only 22 cars were placed on defendant's tracks as of 7:00 a.m. on May 5, 1970, it nonetheless argues that the defendant's "tracks were full at 7:00 a.m." In view of our ultimate disposition of defendant's defense to demurrage charges on this date, we will assume that defendant had sufficient capacity for additional cars.

7. A car is "run-by" when it is passed through without unloading.

liable. Under the applicable tariff, demurrage is computed on twenty-four hour periods running from 7:00 a. m. to 7:00 a. m. If a car is placed after 7:00 a. m. on any day demurrage does not begin to accrue until 7:00 a. m. the following morning. Similarly, if a car is released after 7:00 a. m., it incurs demurrage for the whole day regardless of the actual time of release. In view of this, the uncontradicted testimony of the witnesses at trial was that a time for the placement or release of a particular car noted on Form 4625 is "irrelevant and an arbitrary figure differing from clerk to clerk."

The inaccuracy of the record relied upon by defendant is further high-lighted by the fact that the mid-day switch list for October 25 shows that defendant requested at 1:00 p. m. that only sixteen cars be pulled from its north tracks. Thus, if these records are correct, defendant still had eleven cars waiting to be unloaded at 1:00 p. m. Given the testimony discussed above, plaintiff's demurrage clerks could have listed all twenty-five cars as released at 11:00 a. m. on Form 4625, without any effect on demurrage, even though eleven cars were not yet unloaded.

Defendant argues in its suggestions that this switch list is inaccurate and unreliable, and cannot serve as a basis for a finding that eleven cars in fact had not been unloaded at 1:00 p. m. Defendant's point is well-taken. Unfortunately for its position, however, similar considerations are applicable to all of plaintiff's records, including those upon which defendant relies. Any finding we would make based solely upon these records would at best be mere speculation, regardless of whether we adopted plaintiff's or defendant's interpretation of the documents. Since we are unable to ascertain the capacity of the defendant's siding at the mid-day switch, we find and conclude defendant has failed to met its burden of proof in this regard.[8]

## B.

For the reasons discussed at length above, defendant has been able to prove that its siding had sufficient capacity for additional cars only for the evening switch on particular days. However, we find and conclude that defendant may not avoid demurrage charges for these days inasmuch as it has failed to prove that it had actual ability to have unloaded additional cars even if they had been placed.[9]

The record of this case is void of any substantial evidence that the defendant was ever delayed in the unloading of any car by plaintiff's failure to provide a scheduled switch. The only evidence apparent in the record to support such a contention is various unsigned handwritten notations made by defendant's employees on the daily demurrage sheets. Such notations normally stated that there was "railroad delay" of a certain duration.[10] Such cryptic notations, standing alone, are not sufficient to es-

8. We, of course, recognize that the patterns of proof on the issue of capacity vary for each of the contested dates. In each case, however, as it did for October 25, defendant relies primarily on Form 4625. In view of our conclusion concerning the probative value of that Form, we find it unnecessary to discuss in detail the remaining contested dates.

9. We also make a similar finding with regard to the contested "mid-day" switches discussed above. This finding shall be an independent and alternative ground to support our conclusion that the defendant failed to carry its burden of proof concerning these instances.

10. These notations were occasionally somewhat more specific. For example, the records for November 2, 1968 contain the following notation: "On 11/22 RR wrecked two cars. 2 P.M. unable to load or unload after 2 P.M."

Such notations as this are certainly more probative than a mere notation of "railroad delay." We need not, however, reach the question of whether this would be sufficient to meet defendant's burden to show an actual ability to unload since, as we held above, defendant has failed to prove that it had capacity for additional charges at the mid-day switch.

tablish that defendant's crews were actually delayed in unloading or idled by plaintiff's failure to provide proper switches. Nor has defendant been able to produce any evidence supporting or explaining these notations. Defendant's own witnesses were unable at trial to recall specific delays on the particular days in issue. Indeed, defendant's own records establish that on some days when switching failures were alleged, defendant's crews were in fact working overtime.[11]

These considerations are sufficient in themselves to require rejection of defendant's contention. But there is another, equally compelling consideration which leads us to this conclusion. The evidence in the record, both documentary and testimonial, reflects the nearly total absence of any protest by the defendant on the days in question concerning plaintiff's alleged switching failures. Admittedly, there is some evidence on the record that the matter of switching was discussed by the parties. However, defendant has not been able to produce any significant evidence that it seriously and strenuously objected to the alleged delays in switching. Certainly, if defendant had lodged a formal complaint with the railroad each time delay occurred "its conduct then would have been more in consonance with its present contention," Union Bag & Paper Corp. v. Director General, *supra*, at 717. Its failure to do so, while alone not dispositive, nonetheless casts serious doubt on its claim that the demurrage charges were caused by plaintiff's alleged switching failures.

Defendant's contentions are further weakened by the uncontroverted evidence adduced at trial that its policies during the periods of time at issue were not designed to ameliorate the conditions, but instead actively exacerbated the situation. One of the basic causes of the tie-up in cars was a shift in defendant's management personnel. This change in operations led to a short-term lack of coordination, both among defendant's work force and with the railroad. The records before us reveal that such confusion seriously disrupted unloading schedules, and reduced the rate at which cars were unloaded. Moreover, defendant admits that it "could ask suppliers to stop shipping for a period of time." As the Commission stated in *National Trucking, supra*, at 545, where a consignee knew that:

cars for its account were accumulating, and regardless of the cause of that accumulation, [it] should have taken steps to prevent the shipment of cars which continued and increased that accumulation.

See also 228 F.2d at 28. Its failure to take such steps in this case was the primary cause for the accrual of demurrage.

We therefore find and conclude that defendant has failed to carry its burden of proof to show that it had the actual ability to have unloaded additional cars had they been placed on its siding. In view of this failure of proof, we further find and conclude that plaintiff is entitled to judgment in the amount of $10,480.00 in No. 19741–1 and $5,880.00 in No. 73 CV 293–W–1, plus prejudgment interest on these amounts at the rate of six percent per annum. Louisiana & Arkansas Railway Co. v. Export Drum Co., 359 F.2d 311 (5th Cir. 1966).

## V.

Accordingly, and for the reasons stated, it is

Ordered (1) that in No. 19741–1 the Clerk shall, pursuant to Rule 58 of the Rules of Civil Procedure, forthwith prepare, sign and enter a judgment for the plaintiff against the defendant in the amount of $10,480.00 plus costs and prejudgment interest at the rate of six percent per annum. It is further

Ordered (2) that in No. 73 CV 293–W–1, the Clerk shall, in a similar man-

11. See, e. g., October 28, 1968.

ner, forthwith prepare, sign and enter a judgment for the plaintiff against the defendant in the amount of $5,880.00 plus costs and prejudgment interest at the rate of six percent per annum.