669 F.2d 417
 ARMCO, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Atchison, Topeka & Santa Fe Railway Co., Chicago Rock Island
& Pacific Railroad, William M. Gibbons, Trustee,
Missouri-Kansas-Texas Railroad, Missouri
Pacific Railroad Co., Intervenors.
 No. 80-3124.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 10, 1981.
Decided Feb. 1, 1982.
 
 Frank C. Brooks, Brooks & Brooks, Dallas, Tex., James G. Headley, Frost & Jacobs, Cincinnati, Ohio, John A. DiNardo, Middletown, Ohio, for petitioner.
 Richard A. Allen, Gen. Counsel, Evelyn G. Kitay, Robert J. Grady, I. C. C., Washington, D. C., John J. Powers, III, Frederic Freilicher, Dept. of Justice, Antitrust Division, Washington, D. C., for respondents.
 Richard E. Weicher, Gen. Atty., Santa Fe Industries, Chicago, Ill., for intervenor AT&SF (Santa Fe Industries).
 Before KEITH and MERRITT, Circuit Judges, and GUY, District Judge.*
 MERRITT, Circuit Judge.
 
 
 1
 At issue here is the railroad tariff which permits shippers of iron and steel to stop and temporarily unload their shipments in transit for the purposes of performing certain permitted fabrication operations on the iron or steel at the transit stop, before sending the shipment on to its specified destination. This "transit tariff" permits shippers to pay a single through rate from point of origin to destination rather than the more expensive combination of two flat rates (from origin to the fabrication point, and from there to the destination), which would ordinarily be charged if a shipment is unloaded at any point.
 
 
 2
 The petitioner steel manufacturer, Armco, Inc., seeks review and reversal of an ICC decision that Armco must first establish that the iron and steel being shipped from its transit points (Houston and Kansas City) can be identified with that being shipped into the transit point by rail before it can qualify for the lower in-transit rate. Armco argues that the tariffs should be read to permit substitution of steel produced locally at the transit point, provided the quantities of in-bound and out-bound steel are equivalent, because exact matching of incoming raw materials with out-bound fabricated items is impractical. A contrary rule, Armco contends, would be unreasonable and discriminatory in violation of 49 U.S.C.A. §§ 10701 & 10741 (Supp.1980).
 
 
 3
 The threshold question here is whether the ICC's interpretation of the tariff as forbidding substitution of local steel production and requiring strict compliance was arbitrary or capricious. If the ICC's interpretation of the tariff is not arbitrary, we must determine whether a nonsubstitution rule is unreasonable or discriminatory under the Interstate Commerce Act. Additionally, we must determine whether-even if local substitution were permitted-the ICC acted arbitrarily in holding that Armco was ineligible for the lower transit rate because of its failure to comply with the minimal record-keeping requirements. We find that the ICC acted reasonably in denying Armco's request for transit concessions and therefore affirm.
 
 
 4
 The transit tariff substitution rule published by defendant Santa Fe provides (much like the tariffs of other railroads) that if
 
 
 5
 (t)he identity of the commodities unloaded into a Transit House cannot be preserved and the integrity of the through rate ... (is) preserved by the requirements as to the surrender of inbound freight bills and the maintenance and verification of records of receipts and shipments by authorized representatives of the railroad and cancellation of freight bills or tonnage credit slips as provided in this tariff, the substitution of commodities originating on one line for like commodities originating on other lines will be permitted.
 
 
 6
 (App. 3). The plain language of the rule indicates that only substitution of like commodities shipped in by other railroad lines will be permitted upon the condition that appropriate records are kept. Armco fails to establish why the ICC's reading of such clear language should be rejected. Indeed, in 1973 Armco entered into agreements with the Western Weighing and Inspection Bureau (a division of the Western Railroad Association) to maintain and make available specified records to enable the railroads to verify the transit claims by correlating in- and out-bound shipments by rail. Having entered into such an explicit agreement to comply with the transit rules, Armco cannot now claim that the tariff was ambiguous on whether locally produced steel could be shipped at the concession rates intended for products shipped in by rail.[1] The explicit record-keeping requirements set forth in the tariff and the 1973 agreements belie any assertion that rail origin was not required for the out-bound transit concession. None of the cases cited by Armco show that the ICC has interpreted the transit tariff to permit out-bound substitution of locally produced steel for steel brought in by rail. See, e.g., Fabrication-In-Transit Charges, 29 I.C.C. 70 (1914) (speaks only of rail for rail substitution); Texas Steel Co. v. Missouri-K.-T. Co., 220 I.C.C. 73; 225 I.C.C. 337 (1937) (no question of local substitution raised); Substitution of Cotton in the Southwest, 241 I.C.C. 153 (1940) (concerns substitution under circumstances peculiar to the cotton industry).
 
 
 7
 Since the ICC cannot be said to have acted arbitrarily in reading the tariff to forbid substitution, the question arises whether such a rule is unreasonable under the ICC Act. Armco's argument on this issue is essentially a factual one: that it is commercially impractical to trace the identity of in-bound iron and steel through the production process to determine whether the out-bound products are made from the incoming rather than local steel. The record indicates that source-identification of quality controlled products could be made with revised but elaborate record-keeping procedures (because the "heat number" of the unfabricated steel accompanies the final product) whereas source-identification of non-quality controlled items can only be made by costly separate storage procedures. The ALJ found that although it was impractical to identify the source of out-bound products, impracticality was not dispositive of the question whether the non-substitution rule was reasonable. On administrative appeal, however, the ICC found that compliance with the identification procedures was not impractical, but also agreed that impracticality for the shipper was not dispositive. Thus the question before us is whether or not the non-substitution rule is practical, the tariff can, as the ALJ found, be deemed reasonable. The non-substitution rule is supported by the two rationales offered for the transit tariff discount: first, to encourage use of rail transport for both in- and out-bound traffic and second, to protect against possible tariff fraud. As Justice Brandeis noted in Central R.R. Co. v. United States, 257 U.S. 247, 42 S.Ct. 80, 66 L.Ed. 217 (1921), the transit tariff concession
 
 
 8
 is sometimes beneficial in its results; but it is open to grave abuses (footnote omitted). To police it adequately is difficult and expensive. Unless adequately policed, it is an avenue to illegal rebates and seriously depletes the carriers' revenues.
 
 
 9
 In light of these considerations, we agree that the ICC's finding that the non-substitution rule was reasonable, even though Armco would find compliance difficult given its current record-keeping procedures.
 
 
 10
 In support of its argument that the non-substitution rule is discriminatory under § 10741 (which requires that the same rates be charged for similar services rendered to shippers in like circumstances), Armco argues that it alone is adversely affected by the rule since no other steel manufacturer in the relevant ICC jurisdiction produces steel locally at a transit point. However, the disposition of this issue appears to turn on the determination whether the rule permitting substitution of commodities transported by other (rail) lines but prohibiting substitution of locally produced goods is a reasonable one. Since the record amply supports the ICC's determination that such a distinction is reasonable there can be no plausible discrimination argument under § 10741. Quite simply, the primary rationale for the concession is to encourage use of rail transport to and from the transit point. Since all shippers who cannot show records of in-bound rail traffic to corroborate their claims are equally affected by the rule, Armco has no basis to complain of discrimination.
 
 
 11
 Finally, it should be noted that Armco does not contest the fact that in filing its claims for the transit tariff discount it did not even comply with the minimal substitution rules which require shippers to cancel from the matched in-bound tonnage the amount of wastage and scrap that results from the production of the fabricated out-bound goods. The ICC indicated that such non-compliance with tariff requirements itself would justify the railroad's denial of the transit discount. Armco would have it that these are collateral issues that could be corrected once its right to substitute is conceded. However, the ICC has found that compliance with the transit tariff rules is a prerequisite for eligibility for the tariff. Given the plain language of the representative Santa Fe tariff, supra, we find no grounds to reverse such a finding.
 
 
 12
 Since the ICC has acted reasonably in reading the transit tariff to preclude substitution of locally produced commodities and since its findings that such a rule is not unreasonable is supported by substantial evidence, the decision of the ICC is affirmed.
 
 
 
 *
 The Honorable Ralph B. Guy, Jr., Judge, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Also, in view of the clear language of the tariff and the 1973 agreements, Armco cannot rely on the allegation that one of the defendant railroads permitted substitution of locally produced steel in a similar transit tariff in the 1950's. Even if the record were clearly to establish such a practice-which it does not-the 1973 record-keeping requirements can only be understood to require some degree of corroboration between in- and out-bound rail traffic seeking to qualify for the transit concession; any lingering misapprehensions about the tariff should thus have been dispelled